**Tammy Renee WHITWORTH, Appellant,**

v.

**Douglas Wayne WHITWORTH, Appellee.**

No. 01–04–01026–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 16, 2007.

---

Walter P. Mahoney, Jr., The Mahoney Law Firm, Pasadena, for Appellant.

Marla Mitschke, Linda G. Cryer, Houston, for Appellee.

Panel consists of Justices NUCHIA, KEYES, and HANKS.

## OPINION ON REHEARING

GEORGE C. HANKS, JR., Justice.

Carol Whitworth, the intervenor, filed a motion for rehearing. We withdraw our Opinion and Judgment of November 22, 2006 and grant the motion for rehearing.

Appellant, Tammy Renee Whitworth, challenges the trial court's final decree of divorce that named intervenor, Carol Whitworth, sole managing conservator of Tammy's minor child, K.C. In two issues on appeal, Tammy argues that the trial court erred (1) in failing to name her as joint managing conservator and (2) in giving her less than a standard possession order. We affirm.

### Background

Tammy and Douglas Whitworth married in August 2000, but separated in September or October 2000. Douglas filed an original petition for divorce a couple of months later. A second original petition for divorce was filed by Tammy, and the trial court signed an order of consolidation. Tammy and Douglas's only child, K.C., was born on June 13, 2001.[1] By order entered November 30, 2001, Tammy was given custody of K.C. and Douglas was given two hours a day visitation five days a week and ordered to pay $500 a month to Tammy as temporary spousal support. Three months later, Tammy filed a motion for enforcement of temporary spousal support.

Almost one year after Tammy was given custody, the trial court heard the parties' application for temporary custody orders pending the divorce. Although we have no

---

1. Tammy has two other children, A.C. and J.C., who are from different fathers.

transcript of the hearings held on a Friday and Monday, testimony from the divorce hearing indicates that the trial court heard testimony that Tammy had repeatedly denied Douglas access to K.C., had alleged that Douglas sexually abused A.C., K.C.'s half-sister, and feared his unsupervised visitation with K.C. Douglas repeatedly denied these allegations. The testimony further indicated that, during the course of the earlier hearing, the trial court ordered Tammy to have her mother, Gayle Cash, bring K.C. to the court and warned her numerous times that she would be held in contempt if she did not, but Tammy did not have K.C. brought to the court. The docket sheets reflect that, at the end of the Friday hearing, the trial court found Tammy in contempt and sentenced her to 10 days in jail for "continuous parental alienation against father through repeated visitation/access denials and behavior in court."

On the same day as the Friday hearing, Carol Whitworth, Douglas's mother, filed an original petition for intervention stating that she was K.C.'s paternal grandmother and requesting that K.C. be placed in her care on "a temporary and/or permanent basis."

Tammy stayed in jail for the weekend and appeared in court for the continuation of the hearing on Monday. At the end of the hearing, the trial court entered an order appointing Carol, the intervening grandparent, as temporary sole managing conservator of K.C. and Tammy and Douglas as temporary possessory conservators with only supervised rights of possession for four hours every other week through the SAFE Supervised Visitation Program of the Victim's Assistance Center ("SAFE"). The docket sheet from the Monday hearing stated that Tammy and her mother, Gayle Cash, had "exercised continuous parental alienation against father through repeated visitation/access de-

nials and behavior in court during this hearing" and that supervised visitation was ordered because of the seriousness of the allegations against Douglas and the fact that the trial court deemed Tammy a "flight risk with child as demonstrated by her behavior to court since 10/18/02 [the Friday hearing]." The trial court ordered Dr. Edward Silverman to conduct psychological evaluations of Tammy, Douglas, and Carol. Both Tammy and Douglas were ordered to pay Carol child support for K.C. and to ensure the maintenance of health insurance for K.C. The trial court also enjoined Tammy from telephoning Carol and from going within 50 feet of Carol's residence. Four months later, the trial court also ordered that Tammy and Douglas were enjoined from taking photos of K.C. while she was at SAFE.

More than one year later, on April 13, 2004, the trial court heard evidence to determine custody of two-year-old K.C. At the time of trial, Douglas was not seeking primary custody of the child. The trial court entered a final decree of divorce stating that neither Tammy nor Douglas would be the managing conservator of K.C. because it "would not be in the best interest of the child because such appointment would significantly impair the child's physical health or emotional development."

The decree ordered that Carol, the intervening grandparent, be appointed as the sole managing conservator of K.C. The trial court found that a standard possession order for either Tammy or Douglas was inappropriate and not in the best interest of K.C. It ordered that Tammy continue to have only supervised visitation for four hours every other Saturday and that Douglas have supervised visitation to be determined by his mother, Carol. The trial court entered no findings of fact or conclusions of law. Two months later, Tammy filed a motion for new trial, which

the trial court denied. Tammy appeals from the trial court's custody determination in the divorce decree.

### Standing

 We first review Carol's standing to intervene in this action. The parties did not raise standing in their initial set of briefs nor was a motion to strike the intervention filed with the trial court, but we may address it sua sponte.[2] We review a court's determination of a grandparent's standing to intervene in a pending divorce proceeding under an abuse of discretion standard. *See* Tex. Fam.Code Ann. § 102.004(b) (Vernon Supp.2006). A trial court abuses its discretion when its decision is arbitrary or unreasonable. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex.1982).

 Carol has standing to intervene in this action. Generally, an intervenor must show standing to maintain an original suit in order to intervene. *Segovia–Slape v. Paxson*, 893 S.W.2d 694, 696 (Tex.App.-El Paso 1995, no writ); *McCord v. Watts*, 777 S.W.2d 809, 812 (Tex.App.-Austin 1989, no writ). This showing requires that the intervenor have some present justiciable interest in the subject matter of the suit. *Segovia–Slape*, 893 S.W.2d at 696. However, an intervenor in a suit affecting the parent-child relationship does not need to plead or prove the standing required to institute an original suit because managing conservatorship is already in issue. *Id.* Specifically, section 102.004(b) of the Family Code provides that the trial court may grant a grandparent leave to intervene in a pending suit filed by a party authorized under section 102 of the Family Code to bring an original suit affecting the parent-child relationship. Section 102.004(b), as it existed at the time that Carol and Douglas filed their divorce, provided that:

An original suit requesting possessory conservatorship may not be filed by a grandparent or other person. However, the court may grant *a grandparent* or other person deemed by the court to have had substantial past contact with the child leave to intervene in a pending suit filed by a person authorized to do so under this subchapter.

Tex. Fam.Code Ann. § 102.004(b) (Vernon Supp.2006) (emphasis added); *see In re M.A.M.*, 35 S.W.3d 788, 790 (Tex.App.-Beaumont 2001, no pet.) (holding that trial court did not abuse its discretion by allowing the intervention of biological grandparent under section 102.004(b)); *McCord*, 777 S.W.2d at 812 ("It has been held that, as a matter of law, grandparents possess a justiciable interest in their grandchild" and that grandparents who intervene in a proceeding are not required to plead and prove the requirements for standing to bring an original action.). This subchapter applies to interventions seeking managing conservatorships as well as those seeking possessory conservatorships. *In re Hidalgo*, 938 S.W.2d 492, 496 (Tex.App.-Texarkana 1996, no writ).

This relaxed standing rule for intervention promotes the overriding policy in all suits affecting the parent-child relationship, that of protecting the best interest of the child. *Segovia–Slape*, 893 S.W.2d at 696; *see also In the Interest of K.T. & M.T.*, 21 S.W.3d 925, 927 (Tex.App.-Beaumont 2000, no pet.) ("Sound policy underlies the Legislature's creation of a relaxed standing rule subject to court discretion for intervention in an existing suit. Where a suit is already pending, concern for the privacy of the parties is subordinate to the overriding concern for the best interest of the children."); *Harrison v. Harrison*, 734 S.W.2d 737, 740–41 (Tex.App.-Eastland 1987, no writ) ("There is a significant dif-

---

**2.** We asked the parties to file supplemental briefs addressing standing.

ference between filing an original proceeding which could disrupt the children's relationship with their parents and intervening in a pending suit in which that relationship had been sufficiently interrupted to cause the filing of a suit requiring the courts to decide what decree would be in the children's best interest."); *Young v. Young,* 693 S.W.2d 696, 698 (Tex.App.-Houston [14th Dist.] 1985, writ dism'd) ("Intervention under these circumstances may enhance the trial court's ability to adjudicate the cause in the best interests of the child."). Thus, while the statutory scheme assures that grandparents are not entitled to disrupt the child's family life and initiate suits for managing conservatorship except in limited circumstances, once the child's best interest is before the court and being litigated, the trial court has discretion to determine that the intervention by a grandparent may enhance the trial court's ability to adjudicate what is in the best interest of the child. *McCord,* 777 S.W.2d at 812.

In the instant case, Tammy and Douglas had filed a suit for divorce. As K.C.'s biological parents, pursuant to section 102 of the Family Code, they were both authorized to file an original suit affecting the parent-child relationship. Allegations of inappropriate and questionable behavior

by both parents had been asserted, raising the question of parental custody. It was in this context that Carol filed a petition for intervention. Carol's petition was filed on the same day that the trial court found Tammy in contempt and sentenced her to 10 days in jail. Carol is K.C.'s undisputed paternal grandmother and contends that her appointment as managing conservator would be in the child's best interest. Accordingly, the trial court did not abuse its discretion in finding that she had standing to intervene in this suit. *See In re M.A.M.,* 35 S.W.3d at 790.[3]

### Sole Managing Conservatorship

In two issues, Tammy argues that the trial court erred by appointing Carol as the sole managing conservator with primary physical possession of K.C. and giving Tammy a less than standard possession order. Tammy contends that awarding managing conservatorship to Carol under the facts of this case violated section 153.131 of the Family Code and the Due Process Clause of the United States Constitution. *See* TEX. FAM. CODE ANN. § 153.131 (Vernon 2002).

### Standard of Review

 We review a trial court's determination of conservatorship for an abuse

---

**3.** The dissent apparently argues that, under the holding in *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), it would be unconstitutional for the trial court to allow Carol to intervene under section 102.004(b). *Troxel* involved the constitutionality of a grandparent visitation statute that allowed any person to petition the court for visitation rights at any time and allowed the court to grant such rights based on the best interest of the child. *Id.* at 60, 120 S.Ct. at 2057. The Supreme Court held that the statute was unconstitutional because it infringed on a parent's fundamental right to make decisions concerning the care, custody, and control of her children. *Id.* at 72, 120 S.Ct. at 2063. *Troxel* does not, however, affect the issue of establishing standing to intervene in

an ongoing suit affecting the parent-child relationship presented by the case before us. In this case, section 102.004(b) does not interfere with a parent's right to make decisions concerning her children. As shown below, before Carol could be awarded managing conservatorship, she was still required to overcome the strong parental presumption in favor of Tammy in a trial on the merits. *See, e.g., In re SSJ–J,* 153 S.W.3d 132, 138 (Tex. App.-San Antonio 2004, no pet.) (holding that *Troxel* opinion did not affect issue of grandparent standing because Texas Family Code standing statute does not overrule parental presumption). As courts have repeatedly held, standing to intervene means only the right to be heard, not the right to win. *Id.*

of discretion. *Gillespie*, 644 S.W.2d at 451. The test for an abuse of discretion is whether, in the opinion of the reviewing court, the trial court's rulings were arbitrary or unreasonable. *Id.* The mere fact that a trial judge may decide a matter within his discretion in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Sw. Bell Tel. Co. v. Johnson*, 389 S.W.2d 645, 648 (Tex.1965). An abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Lide v. Lide*, 116 S.W.3d 147, 152 (Tex.App.-El Paso 2003, no pet.).

### Section 153.131 of the Family Code

There is a strong presumption that the best interest of a child is served if a natural parent is appointed as a managing conservator. Tex. Fam.Code Ann. § 153.131(a) (Vernon 2002); *Brook v. Brook*, 881 S.W.2d 297, 299 (Tex.1994); *In re De La Pena*, 999 S.W.2d 521, 527 (Tex. App.-El Paso 1999, no pet.); *In the Interest of A.D.H.*, 979 S.W.2d 445, 447 (Tex. App.-Beaumont 1998, no pet.). Section 153.131(a) statutorily provides for the appointment of the parent as sole managing conservator or the parents as joint managing conservators, unless the court finds the appointment would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development. Tex. Fam.Code Ann. § 153.131(a).

For the court to award managing conservatorship to a non-parent under section 153.131, the non-parent must prove by a preponderance of credible evidence that appointing the parent as a managing conservator would result in serious physical or emotional harm to the child. *Brook*, 881 S.W.2d at 298; *In the Interest of M.W.*, 959 S.W.2d 661, 665 (Tex.App.-Tyler

1997, no writ). There must be evidence to support the logical inference that some specific, identifiable behavior or conduct of the parent will probably cause that harm. *M.W.*, 959 S.W.2d at 665. This link between the parent's conduct and harm to the child may not be based on evidence which merely raises a surmise or speculation of possible harm. *Id.* When a non-parent and a parent are both seeking managing conservatorship, "close calls" go to the parent. *Id.* at 666; *Ray v. Burns*, 832 S.W.2d 431, 434 (Tex.App.-Waco 1992, no writ).

An adult's future conduct may be somewhat determined by recent past conduct. *M.W.*, 959 S.W.2d at 666. In and of itself, however, evidence of past misconduct may not be sufficient to show present unfitness. *Id.* Further, it is wholly inadequate to simply present evidence that a non-parent would be a better choice as custodian of the child. *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990). The non-parent must offer evidence of specific acts or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child. *Id.* Specific acts or omissions of a parent implicating a significant impairment to a child's emotional development may be inferred from direct evidence. *De La Pena*, 999 S.W.2d at 529.

Custody disputes by their very nature are inherently fact-intensive. *Id.* Appellate courts routinely defer to the fact finder at trial concerning matters of credibility and demeanor, but perhaps in no other type of litigation is it more critical. *Id.*

In this case, during the divorce trial, the trial court heard testimony from numerous witnesses who presented the trial court with specific, credible evidence

that, if Tammy was given managing conservatorship, K.C.'s emotional health would be significantly impaired. First, there was evidence presented to the trial court that Tammy has a history of subjecting K.C. to repeated investigations for claims of sexual and physical abuse when there was no evidence of abuse. There was evidence that, if Tammy was given managing conservatorship, she would continue to make such reports and significantly impair K.C.'s emotional health. Second, there was evidence presented to the trial court that Tammy has a history of denying K.C. any contact with her biological father. There was evidence presented that, if Tammy was given managing conservatorship, she would continue to deny K.C. access to her father, which would significantly impair K.C.'s emotional health.

### 1. Repeated investigations for abuse

During the divorce trial, the trial court heard evidence that, after Carol was given temporary managing custody of K.C., Tammy began making claims to CPS and law enforcement authorities that K.C. was being neglected by Carol and was being molested by Douglas. As a result, K.C. was subjected to repeated investigations by CPS and law enforcement authorities who found no evidence to support any of Tammy's very specific and graphic claims of abuse.

#### a. Christina Bailey

Christina Bailey, a Children's Protective Services ("CPS") investigator, testified regarding her investigations into Tammy's allegations of abuse. She testified that, after Carol received custody, CPS received eight reports of physical abuse and neglect to K.C. by Carol and Douglas.

*First Report:* On November 3, 2002, just two weeks after Carol received custody of K.C., CPS received an anonymous

report of the abuse of K.C.[4] The caller reported that K.C. had what appeared to be cigarette burns all over her, had lost a lot of weight and was very pale, had bruises and bumps all over her body, had some kind of open sores on her head that were oozing pus, had scratch marks on her face, and had a rash that was covering her from head to toe. The caller also reported that K.C. spent a lot of time with Douglas. A CPS caseworker investigated the claims. She met with Carol, physically observed K.C., and found no evidence of abuse. Despite Tammy's testimony that the investigations were "inconclusive," Bailey testified at the divorce trial as follows:

Q. So did—so was there a finding of any cigarette burns?

A. No.

Q. No finding of weight loss?

A. No.

Q. No finding of bruises all over the body?

A. No.

Q. No open sores?

A. No.

Q. And no scratch marks to the face?

A. No.

CPS determined that K.C. did have some red sores on her body but they were not the result of abuse or neglect.

*Second Report:* On March 18, 2003, Tammy reported to CPS that K.C. had been physically neglected by Carol and sexually abused by Douglas. Tammy reported that K.C. had vaginal irritation that was not consistent with diaper rash and that this was a sign that she was likely being sexually abused and that K.C.'s hair smelled like urine and cigarette smoke and K.C. was not thriving and was underweight. Bailey met with Carol and K.C.

---

**4.** Although Tammy admits that she made similar reports of abuse to CPS, she denied making a report on this date. The trial court disagreed and made a contrary finding.

two days after the complaint was made and found no evidence of any physical or sexual abuse. Despite Tammy's testimony that the investigations were "inconclusive," Bailey testified as follows:

Q. Did you see any vaginal irritation?

A. No.

Q. Did her hair smell of urine?

A. No.

Q. Did she look like she was under weight or emaciated?

A. No.

Bailey also testified that she did not find any signs of diaper rash or any redness in K.C.'s diaper area. Bailey saw some areas of K.C.'s skin that had red blotches and was told by Carol that the doctor had diagnosed them as eczema. The case was closed.

*Third Complaint:* On May 19, 2003, Tammy filed a complaint alleging that K.C. had a black eye and that it looked like K.C. had been punched in the eye. She also reported that K.C. had a vaginal irritation up inside the vaginal area that was not consistent with diaper rash (that she did not have any medication or doctor's note for the condition), K.C. had sores with pus in them all over her body (that she did not have any medication for those sores), and Carol had a flea infestation in her home. Bailey again met with Carol and K.C. at Carol's home and found no evidence of any physical or sexual abuse. Despite Tammy's testimony that the investigations were "inconclusive," Bailey testified as follows:

Q. Did you find sores with pus over her body?

A. No.

Q. Did you find any flea infestation in the home?

A. No.

Bailey spoke with K.C.'s pediatrician, Dr. Steven Alley, about Tammy's allegations of vaginal irritation and physical abuse and neglect. Dr. Alley reported that he sees K.C. on a regular basis and has never noticed anything that concerned him in her vaginal area and that K.C. had gained weight since she had been with Carol. He also told the caseworker that Carol had brought K.C. in recently because her eye was swollen from a mosquito bite and that there was no evidence of bruising to the eye. He reported that K.C. had sensitive skin and that Carol had been appropriately treating her for this condition and following his recommendations. Bailey again closed the case and ruled out Tammy's allegations.

*Fourth, Fifth, and Sixth Complaints:* Bailey testified that Tammy filed a series of three complaints on May 19, June 14, and July 1, 2003 against Carol and Douglas. These were handled as a single investigation. These claims were all similar to previous complaints. First, Tammy alleged that K.C. was seen at the SAFE House, where her court-ordered visitations took place, with pus-filled insect bites on her legs, scalp, and all over her body, some of which were bleeding; scratch marks that appeared to have been caused by something scraping across her back from shoulder to shoulder, and underneath the scratch marks there was faint bruising; and redness in her vaginal area that was not consistent with diaper rash. She also reported that Douglas had a history of domestic violence and is violent.

In investigating these claims, Bailey spoke with Mary Nell Timmons, a supervisor at SAFE. Timmons told her that she, too, would be concerned about K.C.'s sores if K.C. were her child. She said that they looked like flea bites. She also said that the sores on K.C.'s body looked really bad and that she had noticed redness in K.C.'s diaper area. However, Timmons told Bailey that she did not think that K.C. was being abused or neglected. She also told Bailey that she was not aware of K.C.

having a black eye and that she did not notice anything wrong with K.C.'s eyes. Timmons said that K.C. looked healthy, not thin or malnourished.

Timmons also informed Bailey that the SAFE staff was concerned that, when she visited, Tammy was constantly taking pictures of K.C.'s vaginal area and was obsessed with what was wrong with K.C. Timmons said that Tammy had to be told to stop taking such pictures of K.C.

Bailey interviewed Carol and Douglas and observed K.C. regarding Tammy's complaints. Bailey also had K.C. medically examined for sexual abuse at the Children's Assessment Center. She testified, in detail, regarding the 30–minute to one-hour examination that was conducted on K.C.

Q. Well, I've been in there a few times. They—they kind of have to pull and twist and turn the child so they can examine and look into the vaginal area and take pictures so they sometimes have to move her into awkward positions.

Q. Is she clothed or unclothed?

A. Unclothed.

Q. Totally unclothed?

A. Yes.

Q. And in that posture, then, the person doing the exam has to move her arms and legs in rigid positions for photographs?

A. Yes.

Q. And after her legs are spread apart, are photographs taken of her vaginal area?

A. Yes.

Q. And in your observations of that, how have the children reacted?

A. Usually they're very uncomfortable. Some scream. It's not a comfortable exam.

Q. Have—would it be a fair statement to say that you've observed a tremen-

dous amount of anxiety on children when they have to undergo that exam?

A. Yes.

Bailey testified that K.C.'s examination produced no evidence of abuse.

Bailey explained to Tammy that, after investigating her claims, CPS had not found any evidence of abuse. Tammy was upset with the examination results and believed that they were incorrect. She insisted to Bailey that the doctors had not looked at K.C. in the right way to see the redness in her vaginal area. Tammy insisted that Bailey examine K.C. herself or that CPS take K.C. to another doctor. Bailey testified that it appeared Tammy wanted K.C. to be continually examined in her vaginal area until something was found and she was not concerned about the resulting trauma to K.C. Bailey testified:

Q. Did she want the child to be continually medically examined in her vaginal area?

A. That was my impression.

Q. Did she show any concern for the trauma that this would put the child through?

A. None.

On July 1, 2003, Tammy also reported that K.C.'s right leg was injured and twisted, her right knee was higher than her left knee, K.C. had difficulty walking, K.C. was crying in pain, and she was covered in mosquito bites. Bailey testified that, when she went to see K.C. at her day care, she found her running and walking in no pain, nothing appeared to be wrong with her legs, and her right knee was not higher than her left knee.

*Seventh Complaint:* On August 11, 2003, Tammy reported that K.C. had vaginal irritation that was not caused by diaper change or diaper rash and that she had witnesses to this fact. She also reported

that K.C.'s vagina was bright red internally and externally and that this was observed on August 9th. She stated that K.C.'s sibling had been abused by Douglas years ago and the sibling had recently made a sexual outcry to a therapist and that CPS had ordered Douglas to have no contact with K.C.'s sibling; K.C. is not able to communicate with people; K.C is showing signs of frustrated behavior; and K.C. has fluid trapped between her knees because of an old knee injury, and it is unknown if she has received any treatment. After speaking with Rita McKinley, a director at K.C.'s day care, and K.C.'s guardian ad litem, the case was administratively closed without a physical examination of K.C.

*Eighth Complaint:* Tammy reported on October 4, 2003 that K.C. had an irritation in her vaginal and rectal areas. Tammy reported that K.C. had bruises on her calves, she was running a fever of 102 degrees, and her legs were misaligned because of an injury. Tammy also reported that K.C. had sores for the past few weeks that appeared to be getting worse, and it was unknown if Carol had taken K.C. to have them treated. After speaking with K.C.'s guardian ad litem, a supervisor at SAFE, and a representative of K.C.'s day care, CPS administratively closed the file on Tammy's complaint without further investigation.

Bailey testified that it was CPS's position that K.C. is a healthy child and that Tammy was notified that CPS's investigations into her reports found no evidence of physical or sexual abuse.

### b. Carol Whitworth

During the divorce trial, Carol testified about the effects of Tammy's claims of abuse on K.C. She stated that, in response to the five complaints in which CPS came out to her home, she had to present K.C. to be examined by the CPS case worker, the guardian ad litem, and then Dr. Alley for abuse. She testified that the process had been physically and emotionally stressful to K.C. Carol testified that it was horrible for K.C. to go through the investigations and that she had to comfort her and let her know that she was being loved and cared for. She testified that K.C. was stressed and not happy with the process, and Carol testified that she believed that the investigations exacerbated K.C.'s outbreak of eczema.

### c. Bob Wooten

Bob Wooten, a captain with the Precinct 3 Constable's office, testified at the divorce trial that he received three calls from Tammy requesting that he go to Carol's house and conduct a child welfare check on K.C. After the first call, he went to Carol's home, but did not find anyone home. He testified that, after the second call, he went and observed K.C. and found nothing wrong with her. He testified that, in the third call, Tammy told him to check on K.C.'s fever. He testified that he went to Carol's home and found nothing wrong with K.C.[5]

### d. Marietta Walker

Marietta Walker, the director of the day care that K.C. has attended almost every day since 2003, testified at the divorce trial that she has never seen K.C. with oozing sores or sores that were oozing pus or blood, an injury to her legs that caused her legs to be misaligned or disfigured, or a black eye that was swollen shut that made her look like she had been punched in the face. She also testified that, during K.C.'s diaper changes, neither she nor her staff had seen a vaginal rash that was excessive beyond diaper rash. She testified that,

---

**5.** Tammy also testified that another officer, Constable Edmundson, did a welfare check on K.C. and found nothing wrong with her as well.

had she seen any of those things, she would have reported it to the Texas Protective and Regulatory System.

### e. Dr. Steven Alley

During the divorce trial, Dr. Steven Alley, K.C.'s pediatrician, testified that he saw K.C. for the first time several days after Carol was given temporary custody. Dr. Alley testified that, when he first saw her, K.C. had a severe eczema skin condition. He testified that the condition could have been there for longer than several days, and it "was not something that had come up overnight." He testified that Carol followed his instructions on caring for K.C.'s eczema.[6] Dr. Alley testified that he saw K.C. in his office at least a couple of times a month for the past year and that he saw no evidence of the alleged abuse reported by Tammy. Dr. Alley testified as follows:

Q. So, you have seen this child numerous times?

A. Correct.

Q. Have you seen any indication of malnutrition in this child?

A. No.

Q. Have you ever seen an excessive bruising on this child?

A. No.

Q. Have you ever—and I may not say this right. Have you ever seen any excessive vaginal rashes on this child?

A. No.

Dr. Alley also testified that he did not observe K.C.'s legs to be bent and twisted, and he did not observe her covered with scars or sores filled with pus and blood. He testified that he saw K.C. with only the typical amount of mosquito bites on her extremities for a child her age. He also testified that he once treated K.C. for vaginitis which cleared up quickly with the use of antibiotics.

### f. Tammy Whitworth

Tammy testified at the divorce trial that she still believes that Douglas abused K.C. and that CPS did not inform her of the results of its investigations. Tammy insists that, to her knowledge, the numerous CPS investigations into her reports were "inconclusive" as to whether abuse occurred. Tammy testified as follows:

Q. Can you tell me how many investigations have been done since this case has started through CPS?

A. No, I couldn't tell you, I don't know.

. . .

Q. And there has [sic] been quite a few, though haven't there?

A. I believe so, yes.

Q. And there's not been one positive finding yet, has there?

A. To my knowledge, they've been inconclusive.

THE COURT: I'm sorry what?

A. They have been inconclusive, to my knowledge.

Tammy testified that she also reported to CPS that Douglas had molested A.C., K.C.'s half sister. She testified that A.C. was interviewed at the Children's Assessment Center and the workers there wanted to perform a gynecological examination of A.C. for evidence of abuse. Tammy told them that an examination had already been performed and that she would provide CPS and the Assessment Center with the results. Tammy testified that she never provided the results to the Assessment Center nor did she provide those records to Jane Markley, A.C.'s therapist. Tammy testified that the result of the CPS investigation into her allegations regarding A.C. was "inconclusive."

Tammy violated the trial court's order to stop taking pictures of K.C. during SAFE visitations and was held in contempt after the court found that, on three separate

---

6. Carol testified that K.C. had eczema when Carol was first given temporary custody.

occasions, she had violated the court's order regarding approaching Carol. Tammy admitted that, at the time that she made her reports to CPS and the constable's office, she was under a court order to contact the guardian ad litem before making any reports to an investigating agency and that she disregarded that order.

### g. Dr. Edward Silverman

Dr. Edward Silverman was appointed by the trial court to examine Tammy, Douglas, and Carol. Dr. Silverman testified that, even after learning of Tammy's history of claims to CPS and repeated violations of the trial court's orders, he still recommended that she be given managing conservatorship. However, he admitted that learning about Tammy's history "absolutely" makes him less confident in his recommendation and more concerned about the issues those facts raise. Dr. Silverman testified as follows:

> Q. Assume with me, Dr. Silverman, that you had at your disposal all of the information regarding the CPS referrals by [Tammy], the validation—the invalidation—pardon me—of those referrals by CPS, violation of this Court's order repeatedly in any number of ways, would that have made any differences at all in your ultimate recommendation about custody?
>
> A. Well, I would have to say probably no in the sense that I have that information now and it would be incumbent upon me to change my recommendation if I felt that was warranted. *Does it make me less confident in my recommendation and more concerned about these issues that those facts raise? Absolutely.*

(Emphasis added.) Dr. Silverman testified that, in his opinion, Tammy was not intentionally fabricating allegations of abuse by Douglas. He stated that, if he believed that she was intentionally fabricating the allegations, his recommendation regarding conservatorship would be different. He testified that Tammy's beliefs of abuse and conduct with respect to Douglas are reasonable and understandable in light of the "great deal of support and validation" she received from SAFE representatives and Jane Markley.[7] He testified that, in his opinion, Tammy's numerous CPS reports were made out of concern for K.C.

Based on her personality test results, Dr. Silverman testified that Tammy has "very significant emotional problems" and is "prone to hyperbole and exaggeration and this further erodes her credibility and trustworthiness with others. *At times, if the end justifies the means, she may even be more blatantly deceptive and manipulative.*" (Emphasis added.) As Dr. Silverman concluded, "And, again those are the sort of things that make it difficult—difficult for someone to trust what she says about a lot of different things." Dr. Silverman's testimony and report of his examination of Tammy's personality traits provided the trial court with a reasonable basis to disbelieve Tammy's allegations of abuse and testimony in this case.

The record contains repeated examples of the type of deceptive and manipulative behavior described by Dr. Silverman. At the divorce trial Tammy was evasive regarding her reports of abuse, and she changed her testimony when she thought that it was in her best interest to do so. For example, on direct examination regarding her reports to CPS of sores all over K.C.'s body, Tammy testified that, prior to Carol receiving temporary manag-

---

7. Dr. Silverman spoke to Markley and Jamie Frank, the director of SAFE, by telephone and included a summary of his conversation with them in his report. Neither Markley nor anyone from SAFE testified at trial nor were their records regarding K.C. submitted to the trial court for review.

ing conservatorship of her, K.C. did not have any skin problems other than three mosquito bites. When confronted with Dr. Bowman's medical records indicating that K.C. had a "rash all over body" while in Tammy's care, Tammy explained that K.C. had an allergic reaction, but she had "never been diagnosed with a skin condition." After she was accused of playing word games, Tammy testified, "Well, it's a skin problem, but not diagnosed as eczema or impetigo like has been suggested." She further acknowledged that Dr. Bowman's notes were in direct contradiction to her testimony in court that K.C. had only a few mosquito bites while in her care.[8] She ultimately admitted that Dr. Bowman's notes reflected a diagnosis of impetigo and diaper rash, seven days before K.C. was released by the court into the custody of Carol.

Dr. Silverman testified that there were things about Tammy's personality and the way she has presented herself that would make it reasonable for the trial court to conclude that she was capable of fabricating allegations in this case:

Q. But if it was in her benefit to make these allegations against Doug, she would persist in those particular items, wouldn't she? Isn't that her nature?

A. What allegations are you referring to?

Q. Say the sexual allegations. If it was to her benefit to make those allegations, she would persist in those would she not?

A. I couldn't answer that with certainty. If you're asking me whether I

think that she's fabricated these allegations about [K.C.'s older sister], that wasn't my conclusion. And if it had been my conclusion then my recommendation would be very different. *If you ask me whether there are things about her personality and the way that she has presented herself that would make one think that she may be capable of doing that, I would say that would be a reasonable conclusion for someone to think that she might be capable of doing that.*

(Emphasis added.)

When asked to confirm his position regarding the allegations of abuse, Dr. Silverman testified that he did not think that Douglas was a sexual predator. Dr. Silverman testified as follows:

Q. Okay in your recommendation, sir, just with respect to Doug, you've recommended that he be given visitation without supervision; is that correct?

A. That's correct.

Q. Would you, sir, give him that kind of recommendation if you, in fact, thought he was a sexual predator?

A. No.

Dr. Silverman's testimony did not give the trial court any reason to conclude that Tammy would, in fact, change her belief that Douglas was abusing her children and stop reporting him to authorities. Dr. Silverman testified from his report that, once Tammy reaches a conclusion about something important to her, she tends to hold on to this conclusion quite rigidly even in the face of contradictory information.[9]

8. In addition to playing these "word games," Tammy was evasive when she was questioned about whether she influenced K.C.'s half-sister into making an "outcry" of abuse against Douglas by repeatedly discussing her alleged abuse in front of her.

9. As an example of this behavior, Dr. Silverman testified that Tammy believes Douglas to be the biological father of A.C., despite a DNA test that states that he is not the father. Tammy stated to Dr. Silverman that it was her belief that the DNA test was inaccurate because milk products can cause bacteria that invalidate the results of a DNA test.

When responding to a question about whether there was ever anything really wrong with K.C., Dr. Silverman also testified that "ultimately, again even if she is the most well-intended mom on earth who is not being deceitful even for a second, if she continues to always perceive her child as unhealthy, that in and of itself would be detrimental to [K.C.]."

### h. Dr. Sharon Hunt

Finally, the trial court heard evidence from Dr. Sharon Hunt, another court-appointed psychologist who examined Carol and K.C. She testified that, if in response to CPS complaints, a child is repeatedly subjected to interviews for abuse and made to remove her clothes for repeated examinations for abuse, the child's emotional development would be significantly impaired. She also testified that, if a parent who has custody continues to make unsupported claims of abuse by temporary caregivers, a child's emotional development would be impaired and that this would interfere with the child's development of a relationship with the temporary caregivers.

The trial court heard voluminous testimony regarding Tammy's history of subjecting K.C. to repeated investigations for unsubstantiated claims of abuse and her likelihood to continue doing so, thus significantly impairing K.C.'s emotional health. It also heard testimony that Tammy had a history of denying K.C. any contact with her biological father and her likelihood to continue doing so, thus significantly impairing K.C.'s emotional health.

### 2. History of denying K.C. contact with her biological father

During the divorce trial, the trial court heard evidence that, while she had custody of K.C., Tammy repeatedly violated the trial court's visitation orders, denying K.C. access to her father. The trial court heard testimony, disputed by Tammy, that, over the course of one year, Tammy did not allow Douglas access in 82 out of 85 court-ordered visitations. The record reflects that, after "multiple warnings," the trial court sentenced her to 10 days in jail for "continuous parental alienation against father through repeated visitation/access denials and behavior in court." Based on her behavior to the trial court, the court also deemed Tammy a flight risk with K.C. The trial court heard testimony that, as a result of Tammy's conduct, K.C. was prevented from bonding with her father.

Despite this conduct, Tammy testified that it was in K.C.'s best interest to have a good relationship with Douglas and Carol. She testified that, if she were awarded managing conservatorship, she would not "take off" with K.C. and hide her at a relative's house. She testified that, although she had violated a number of the trial court's orders, once the trial was over, she would follow the court's orders.

Tammy testified regarding her history of noncompliance with the trial court's orders. Tammy admitted that she was held in contempt for violating the court orders concerning K.C.'s visitation with Douglas, presenting K.C. for court hearings, and for her demeanor in the courtroom. Tammy testified that the trial court found her in contempt because she did not have legal representation to present her side of the case.

Dr. Silverman testified that he believed that Tammy would comply with future court orders concerning visitation with Douglas. However, when confronted with evidence of Tammy's significant history of noncompliance and his own prior testimony that the past conduct typically is a strong predictor of future behavior, he considerably qualified his testimony on this issue. Dr. Silverman testified as follows:

> Q. Okay. Would you agree with me that there is a significant history of

noncompliance with the Court's orders?

A. Yes.

Q. And is the past not typically a strong predictor of future behavior?

A. Often it is, yes.

Q. Why in the world, then, would we believe that during the pendency of a lawsuit [Tammy] would violate a court order over and over and over again when the custody of her child was hanging in the balance, and yet, it's your belief if I understand you correctly, that if given custody of this child, she's going to follow this Court's order once she has custody of [K.C.]?

A. *I mean, I think there's good reason to be skeptical of it. It's not like I'm saying I believe very strongly and I have the utmost confidence in that. I'm coming down on that side of the fence, but, however, so slightly.* Some of those violations occurred prior to [K.C.] being taken away—

Q. Yes, they did.

A. —and I think that that—sort of her perception of what could happen to her was probably a lot different then than afterwards. As far as a lot of the violations that you've talked about, I haven't had any opportunity to talk to her about what her thinking was and what—how she would explain her awareness of whether she felt that would jeopardize her ability to have [K.C.] or not.

I mean, there's no question that— that—that those violations were— were, in my opinion, self-destructive. *And there's also no question that I think any reasonable person would have to wonder whether she's going to be able to conform to the requirements of the Court in the future.*

(Emphasis added.) Finally, when asked about the impact to a child from being deprived of her father, Dr. Silverman responded that, "And again, not having a relationship with one's father, I think, significantly impairs one's emotional development."

Based on our review of the evidence, we conclude that the trial court did not abuse its discretion in appointing Carol as the sole managing conservator after finding, by a preponderance of credible evidence, that appointing Tammy as a managing conservator would result in serious physical or emotional harm to K.C. *See Brook,* 881 S.W.2d at 298. We also hold that the trial court did not abuse its discretion in awarding Tammy less than standard possession.[10]

We overrule Tammy's first and second issues.

### Conclusion

We affirm the judgment of the trial court. All outstanding motions are denied as moot.

Justice KEYES, dissenting.

EVELYN V. KEYES, Justice, dissenting.

The majority has reversed itself *sua sponte.* Because I believe the majority's unprecedented and aberrant construction of the Texas Family Code in affirming the family court's actions is unconstitutional and contrary to the established law of this State and its failure to address the dispositive statutory and constitutional issues raised by the appellate briefs and by the

---

10. Tammy also argues that the trial court's action violated her rights to due process under the United States Constitution. However, Tammy did not assert any constitutional claim before the trial court and she has not preserved this issue for appeal. *See* Tex.R.App. P. 33.1.

motion for rehearing is contrary to our mandatory statutory duty to address "every issue raised and necessary to final disposition of the appeal,"[1] I dissent.

The majority now holds that an associate family judge has the authority under Texas law to take a 15–month–old child away from her mother, the court-appointed temporary sole managing conservator of the child pending divorce from the child's father, without any evidence of actual or potential harm to the child from the mother, and to transfer the child into the immediate possession and sole managing conservatorship of a stranger *solely* because the mother had repeatedly violated the associate judge's order that the father have unsupervised visitation with the child for two hours every day due to her belief that the father had sexually abused her four-year-old. The associate judge, whose orders were affirmed by the family court judge, immediately and permanently delivered the child to the *father's* mother, Carol Whitworth, whom the child had never seen, without any evidence in the record that the child's mother, Tammy Whitworth, was unfit; without any evidence that the child, K.C., had ever been harmed by Tammy or was in any danger from Tammy; and without any evidence about Carol, or her home, at all. In addition, the associate judge assessed onerous penalties of support and visitation on Tammy and forbade her the means of checking on K.C.

As shown below, Carol lacked standing to seek immediate possession, temporary conservatorship, or permanent conservatorship of K.C. under the United States Constitution and under firmly established Texas constitutional and statutory law, and, even had she had standing, she could not have been named managing conservator of K.C. in lieu of Tammy under similarly well-established law. The family court's orders transferring immediate pos-

session of K.C. from Tammy to Carol, naming Carol temporary sole managing conservator of K.C., and imposing harsh restrictions on Tammy were invalid and its judgment naming Carol permanent sole managing conservator of K.C. void.

Since October 18, 2001, Tammy has never been allowed more than two hours supervised visitation with K.C. every two weeks, despite there being *no* constitutional, statutory, or evidentiary basis for the family court's orders. This means that K.C. has been kept from her mother by lawless state action from the age of 15 months to the age of six and a half years. No Texas family court judge or associate family court judge has ever heretofore, to my knowledge, been found by any Texas appellate court to have been granted such power by the Texas Family Code or any other law.

Our original opinion in this case issued on November 22, 2006. We held that appellee, Carol Whitworth, lacked standing to intervene in the divorce proceedings of appellant, Tammy Whitworth, and Carol's son, Douglas, to seek sole managing conservatorship of Tammy's and Douglas's minor child, K.C. Therefore, the trial court lacked subject matter jurisdiction over Carol's suit and erred in appointing Carol temporary sole managing conservator and, subsequently, permanent sole managing conservator of K.C. We remanded the case to the trial court for further proceedings in accordance with our opinion.

Carol filed a motion for rehearing. Rather than respond to the issues raised by Carol, the majority reverses itself, summarily holds that Carol has standing on grounds that are, in my view, insupportable, and affirms the trial court's judgment awarding Carol permanent sole managing conservatorship of K.C. I would grant

---

1. Tex.R.App. P. 47.1.

Carol's motion, withdraw our November 22, 2006 opinion and issue this opinion in order to clarify the holding in our November 22, 2006 opinion.[2] I would reverse and render judgment that the trial court's appointment of Carol as managing conservator of K.C. is void, and I would dismiss Carol from these proceedings. I would remand the cause to the trial court with instructions that Tammy be reinstated as sole managing conservator of K.C. and that the court conduct such other and further proceedings as are necessitated by this opinion.

## Background

The majority's opinion omits facts that are, in my view, material to the proper disposition of this case. I would state the material facts as follows.

Tammy and Douglas married in August 2000, but separated in September or October 2000. Douglas filed an original petition for divorce on December 20, 2000. A second original petition for divorce was filed by Tammy on December 23, 2000. On April 20, 2001, the trial court signed an order of consolidation. Tammy and Douglas's only child, K.C., was born on June 13, 2001.[3] The parties reconciled off and on, separating for the final time in January 2002. By order entered November 30, 2001, Tammy was given custody of K.C. and Douglas was given two hours a day visitation five days a week and ordered to pay $500 a month to Tammy as temporary spousal support. On February 22, 2002, Tammy filed a motion for enforcement of temporary spousal support.

On October 18 and 21, 2002, the trial court heard the parties' application for temporary custody orders pending the divorce. Although we have no transcript of the hearing, testimony from the divorce hearing indicates that the court heard testimony that Tammy had repeatedly denied Douglas access to K.C. and that Tammy alleged that Douglas had sexually abused A.C. and she feared his unsupervised visitation with K.C. The testimony further indicated that, during the course of the hearing on October 18, the associate judge ordered Tammy to have her mother, Gayle Cash, bring K.C. to the court and warned her numerous times that she would be held in contempt if she did not, but Tammy did not have her brought. The trial court also ordered Tammy to have her mother bring K.C. to court for the October 21 continuation of the hearing. The docket sheets reflect that, at the end of the October 18 hearing, the trial court found Tammy in contempt and sentenced her to 10 days in jail for "continuous parental alienation against father through repeated visitation/access denials and behavior in court." [4]

The same day, October 18, Carol Whitworth, Douglas's mother, filed an original petition for intervention, relying on section 102.004(a)(1) of the Texas Family Code, which grants grandparents standing to seek managing conservatorship of a child when the child's environment "presents a serious question concerning the child's physical health or well-being" or both parents consent. *See* Act of April 20, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 125, *amended by* Act of June 18, 1999, 76th Leg., R.S., ch. 1048, § 2, 1999

---

**2.** Carol filed two timely motions for extension of time to file her Motion for Rehearing. I would grant the first motion and deny the second as mooted by her filing of the Motion.

**3.** Tammy has two other children, A.C. and J.C., who are from different fathers.

**4.** Tammy testified at the divorce hearing that the associate judge found her in contempt because she did not have legal representation to present her side of the case.

Tex. Gen. Laws 3877, 3878 (current version at TEX. FAM.CODE ANN. § 102.004(a)(1) (Vernon Supp.2006)) ("TEX. FAM.CODE ANN. § 102.004"). Carol requested that K.C. be placed in her care on "a temporary and/or permanent basis." She stated no facts or substantive grounds for intervention in her petition.

Tammy stayed in jail for the weekend and appeared in court for the continuation of the hearing on October 21. At the end of the hearing, the associate judge entered an order appointing Carol, the non-parent intervenor, as temporary sole managing conservator of K.C. and Tammy and Douglas as temporary possessory conservators with only supervised rights of possession for four hours every other week through the SAFE Supervised Visitation Program ("SAFE").[5] The October 21 docket sheet stated that Tammy and her mother, Gayle Cash, had "exercised continuous parental alienation against father through repeated visitation/access denials and behavior in court during this hearing" and that supervised visitation was ordered because of the seriousness of the allegations against Douglas and the fact that the court deemed Tammy a "flight risk with child as demonstrated by her behavior to court since 10/18/02." The court ordered psychological evaluations of Tammy, Douglas, and Carol by Dr. Edward Silverman. Both Tammy and Douglas were ordered to pay Carol child support for K.C. and to ensure the maintenance of health insurance for K.C. The court also enjoined Tammy from telephoning Carol and from going within 50 feet of Carol's residence.

The court further enjoined Carol from taking K.C. on the Coushatta Indian Reservation[6] and from removing her residence from Harris County. The court also appointed a guardian ad litem for K.C., ordered Tammy and Douglas to share the ad litem's fees, and ordered Douglas to pay spousal support to Tammy. There were no pleadings on file seeking any of the foregoing changes in the temporary orders.

On February 13, 2003, the trial court ordered that the injunction issued on October 31, 2002, preventing Carol from taking K.C. to the Coushatta Indian Reservation, be removed. The court also ordered that Tammy and Douglas were enjoined from taking photos of K.C. while she was at SAFE.[7]

On June 20, 2003, Dr. Silverman, the court-appointed psychologist, submitted a report to Judge Motheral regarding his evaluation of who should have custody of K.C. The report was based on multiple interviews with Douglas and Tammy; one interview with Carol; personality inventory tests administered to Tammy, Douglas, and Carol; observation of Tammy with J.C. and A.C., her two children who had not been removed from her custody; multiple observations of Tammy with K.C. at the SAFE house, beginning in November 2002, shortly after K.C. had been removed from her mother; a videotape of Tammy's house; telephone conversations with Jane Markley, the psychologist for Tammy's four-year-old daughter, A.C., and review of psychotherapy records from that psycholo-

---

5. Although the parties state that the associate judge issued the orders, the temporary orders were signed and entered as orders of the trial court on October 31, 2002. The temporary orders are signed by Carol Whitworth and Douglas Whitworth, but not by Tammy Whitworth. Docket sheets reflect that a motion to recuse the associate judge was filed and denied.

6. Douglas is one-half Native American.

7. Tammy was apparently taking photographs of K.C. to substantiate her allegations that she was being sexually abused by Douglas and that K.C. had sores from being neglected by Carol.

gist; review of medical records of K.C., J.C., A.C., and Tammy; review of school records for J.C. (Tammy's only school-age child); review of court documents; and review of numerous additional materials submitted by Tammy, including, photographs, journal entries, medical records, court documents, school records, utility receipts, and tax records.

Dr. Silverman recommended that both parents be named joint managing conservators of K.C. and that Douglas's initial involvement with K.C. be limited. He also recommended that Douglas be referred to the Houston Council on Alcohol and Drugs and that he be ordered to follow treatment recommendations. After stating that both parents had "significant psychological problems," but that Tammy was "not, however, psychotic and none of her beliefs are patently absurd or entirely implausible," Dr. Silverman concluded that Tammy was the healthier parent and that underneath "is a very committed parent who is genuinely concerned with her children's welfare, who places a high priority on her role as a parent, and who is extremely determined to improve herself, protect her children, and provide them with a safe and healthy environment." He stated his opinion that Tammy was "less dysfunctional" than she had appeared in the litigation and that her reactions were "likely more evident in response to stress." He recommended that if the court found that neither parent could be appointed managing conservator, Carol could be, based on his limited observation of her, but that further investigation should be done.

Dr. Silverman opined,

[Tammy] was clearly [K.C.]'s primary caretaker prior to the temporary change in managing conservatorship in October of 2002 and it appears that she was appropriately attending to [K.C.]'s physical and emotional needs. In fact, if we are assessing [Tammy] as a parent, there is no evidence of abuse, neglect, alcoholism, drug addiction, severe psychopathology, or any other factor that would clearly and unequivocally contraindicate her being an appropriate caretaker for 'K.C.'. Even [Douglas] expressed relatively few concerns about [Tammy]'s parenting apart from his concern that she prevented him from seeing [K.C.] and his concern that she has made false allegations regarding the mistreatment of [A.C.] and [K.C.]. Regarding the allegation that [Douglas] sexually abused [A.C.], unless one assumes that [Tammy] consciously and intentionally fabricated this allegation, it is difficult to fault her for arriving at this conclusion and maintaining this belief. Although CPS [8] closed the case without validating the abuse, the abuse was not ruled out and [A.C.'s] therapist, Jane Markley, continues to have a strong conviction that the abuse may very well have occurred.[9] Similarly, I find it very difficult to fault [Tammy] for expressing concerns about the way [K.C.] is being treated in the home of Carol Whitworth when her observations and perceptions are being independently supported and validated by assumedly neutral and objective staff members at the Victim Assistance Centre. It is not necessary that [Tammy] be correct in her beliefs to

---

8. Children's Protective Services

9. The report records a telephone conversation with A.C.'s psychologist, Jane Markley, to whom Tammy and A.C. had been referred by CPS, in which Markley "stated that [A.C.] told her that Doug touched her tee tee and, in another session, [A.C.] said that he touched her tee tee in the blue car"; A.C. had not wanted to talk in more detail and in general seemed to be well cared for and happy. The report also records Tammy's relation of specific instances of spousal abuse and of several specific detailed instances of sexual abuse of A.C. by Douglas.

be a good parent. It is only necessary that her beliefs be reasonable, understandable, and have some basis in fact.[10] The trial court held no hearing and took no action on Dr. Silverman's report.

Starting on April 13, 2004, a year and a half after removing K.C. from her mother's custody and appointing Carol temporary sole managing conservator, the associate judge heard evidence to determine permanent custody of K.C. At the time of the April 2004 hearing, K.C. was almost three years old and had been in Carol's custody for one and one-half years. At that time, Douglas was not seeking primary custody of K.C. Tammy was employed and was taking care of her other two children, who were developing normally. Dr. Silverman testified that Tammy was a good mother to K.C. and to her other children and that he had found no evidence of neglect or drug or alcohol abuse. He was surprised that K.C. had been taken away from her mother. He testified that both Tammy and Douglas had psychological problems, which in Tammy's case were best described as "being out in left field," but that he did not see anything that would affect Tammy's parenting ability. He recommended that K.C. be returned to the custody of her mother. Dr. Silverman's testimony essentially reflected his report submitted to the trial court ten months earlier.

There was also testimony in the April 2004 custody proceeding that Tammy had called CPS to Carol's home a number of times and that K.C. had been examined for evidence of sexual abuse in response to her concerns, but the results of the CPS investigations were all either inconclusive or concluded without report and no sexual abuse of K.C. was found. Dr. Silverman attributed these calls to Tammy's concern for K.C.'s welfare and testified that reports from SAFE confirmed Tammy's claims that K.C. was dirty and had sores on her. Photographs of K.C. taken by Tammy at SAFE were not admitted into evidence because Tammy had written on the back of them.

Carol's counsel elicited speculative testimony, based on hypotheticals, of potential harm to K.C. if Tammy persisted in a pattern of calling CPS when K.C. was in the possession of another conservator and of having K.C. examined for sexual abuse. Dr. Silverman testified, however, that he did not expect such behavior to continue if K.C. were returned to her mother.

There was no evidence linking any specific act by Tammy to any actual physical or emotional harm to K.C., either before or after the trial court removed K.C. from her custody and possession. Rather, the evidence established that K.C. was developing normally and was healthy both before and after she was removed from Tammy's custody, with the exception of conflicting testimony regarding whether K.C. had developed a limp, been left dirty, and developed sores in Carol's custody.

On May 17, 2004, the trial court entered a final decree of divorce declaring that neither Tammy nor Douglas could be the managing conservator of K.C. because it "would not be in the best interest of the child because such appointment would significantly impair the child's physical health or emotional development." The decree ordered that Carol, the non-parent intervenor, be appointed as the sole managing

10. There was substantial evidence in Dr. Silverman's report of Douglas's spousal abuse, violent behavior, and alcoholism. In addition, the report records an interview with Renee Ramirez, Douglas's former girlfriend, who reported that "[A.C.] might have been molested" but "she does not really know the facts"; that Carol's house was "gross" and "never really clean," and that "there were holes in the walls all over the house as a result of Eric [Douglas's brother] losing his temper and punching holes in the wall."

conservator of K.C. The court found that a standard possession order was inappropriate for either Tammy or Douglas and not in the best interest of K.C. It ordered that Tammy continue to have only supervised visitation for four hours every other Saturday and that Douglas have supervised visitation to be determined by his mother, Carol. The court entered no findings of fact or conclusions of law. On June 14, 2004, Tammy filed a motion for new trial, which the trial court denied.[11] Tammy appealed from the trial court's custody determination in the divorce decree.

## Issues

Tammy complained in her first issue that the trial court erred in failing to name her a joint managing conservator of K.C. in violation of the Due Process Clause of the United States Constitution and of section 153.131 of the Family Code, which establishes the presumption that a parent is to be appointed managing conservator of a child. *See* Tex. Fam.Code Ann. § 153.131 (Vernon 2002). We did not reach these issues in our November 22, 2006 opinion because we concluded that Carol had failed to establish her standing to intervene in Tammy's and Douglas's divorce proceedings to seek managing conservatorship of K.C., and, therefore, the trial court lacked jurisdiction over her claims.

On rehearing, Carol argues that we applied too high a standard of proof to her claims that she had standing to intervene and to obtain immediate possession and temporary and permanent sole managing conservatorship of K.C. and that we should also have considered the preservation of the Indian culture in determining the best interest of K.C.[12] Specifically, Carol argues that (1) we erred in requiring that

the trial court make a threshold finding of serious and immediate concern for the welfare of K.C. before removing Tammy as temporary sole managing conservator of K.C. and appointing Carol as temporary sole managing conservator; (2) we relied on a superseded statute and superseded case law in holding that there must be "a serious and immediate question concerning the welfare of the child" before a nonparent has standing to seek sole managing conservatorship under section 102.004(a)(1) of the Family Code; (3) Tammy must prove that it would be in K.C.'s "best interest" that she, rather than Carol, have managing conservatorship of K.C.; and (4) the best-interest-of-the-child standard should be expanded to "include promotion of the preservation of the Indian culture."

The majority does not address any of these issues. Because I believe they are necessary to the proper disposition of this appeal and, therefore, their consideration is mandatory under Rule 47.1, I would address each of them in order to clarify the applicable standards of proof. In addition, I would address the constitutional due process issues raised by Tammy throughout this litigation, and now given new force by the majority's opinion that Carol satisfied both the standing requirements and the burden of proof for a non-parent seeking managing conservatorship of a child— issues we did not reach in our November 22, 2006 opinion because of our determination that Carol lacked standing to seek managing conservatorship of K.C. under Texas law.

## Standing

### *Standing as a Threshold Issue*

Carol intervened in Tammy's and Douglas's divorce proceedings to seek managing

---

11. The docket sheets reflect that the motion for new trial was denied on July 21, 2004.

12. Douglas is one-half Indian and K.C. one-quarter Indian. As an enrolled member of the Coushatta Tribe, K.C. is entitled to substantial benefits.

conservatorship of K.C. pursuant to former section 102.004(a)(1) of the Texas Family Code, which, in addition to the general standing provided by section 102.003(13) of the Family Code, gave grandparents standing to file a suit requesting managing conservatorship of a child if the order requested was "necessary because the child's present environment presents a serious question concerning the child's physical health or welfare," or "both parents, the surviving parent, or the managing conservator or custodian either filed the petition or consented to the suit." *See* Act of April 20, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 125, *amended by* Act of June 18, 1999, 76th Leg., R.S., ch. 1048, § 2, 1999 Tex. Gen. Laws 3877, 3878 (current version at TEX. FAM.CODE ANN. § 102.004(a)(1), (2) (Vernon Supp.2006)).

These statutory standing requirements raised a threshold issue of whether Carol had standing to intervene in Tammy and Douglas's divorce to seek managing conservatorship of K.C. The parties did not raise standing in their initial set of briefs, but, after seeking supplemental briefing from the parties, we addressed standing *sua sponte* in our November 22, 2006 opinion, as permitted by Texas law.[13] *See Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851 (Tex.2000); *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex.1993).

In its new opinion, the majority omits all mention of former section 102.004(a) of the Family Code, the provision under which Carol intervened. It briefly references section 102.004(b) of the Code, which it contends governs intervention of a grandparent into a SAPCR, without distinguishing between former section 102.004(b), in effect when Carol intervened, and current section 102.004(b); it declares "Carol has standing to intervene in this action"; and it then performs a cursory analysis of general principles of a grandparent's standing to intervene in a SAPCR; and it concludes that "once the child's best interest is before the court and being litigated, the trial court has discretion to determine that the intervention by a grandparent may enhance the trial court's ability to adjudicate what is in the best interest of the child." *Whitworth v. Whitworth*, 01–04–01026–CV, at 622 (Tex.App.-Houston [1st Dist.] Mar. 15, 2007) (op. on reh'g) (quoting *McCord v. Watts*, 777 S.W.2d 809, 812 (Tex.App.-Austin 1989, no writ)). This is an erroneous statement of Texas law.

Because (1) this is an issue of extreme importance to Texas law; (2) the majority's statement of the standing requirements for a grandparent seeking managing conservatorship of a child under Texas law omits any reference to Carol's own stated grounds granting her standing (former section 102.004(a) of the Family Code); (3) the majority's construction of the standing requirements for grandparents seeking managing conservatorship is contrary to the plain language of the statute it purports to construe (former section 102.004(b) of the Texas Family Code, which it represents as still in effect) and contrary to a large body of well-established law interpreting both former and current section 102.004(b); and (4) the majority's construction of section 102.004(b), if correct, would mean that this provision of the Family Code is unconstitutional under the Due Process Clause of the United States Constitution, I will address the law

**13.** On October 3, 2006, we asked the parties to file supplemental briefs addressing standing and both did. After we issued our November 22, 2006 opinion dismissing Carol from this suit for lack of standing, Carol moved for rehearing, raising additional arguments regarding her standing and the proper standard of proof of the best interest of K.C. We address those issues in this revised opinion.

of standing with respect to the issues raised by this case and by the briefing of the parties on appeal and on rehearing in the detail necessary to impart my understanding both of the issues in the case and of the applicable law.

I reiterate my conclusions in our November 22, 2006 opinion that Carol lacked standing to intervene in this case to seek temporary or permanent managing conservatorship of K.C.; the trial court erred in delivering K.C. into Carol's possession and granting her sole temporary and permanent managing conservatorship of K.C.; and Carol should be dismissed from these proceedings.

### Standard of Review of Standing

Standing is implicit in the concept of subject matter jurisdiction. *Waco Indep. Sch. Dist.*, 22 S.W.3d at 851; *Doncer v. Dickerson*, 81 S.W.3d 349, 353 (Tex.App.-El Paso 2002, no pet.). Subject matter jurisdiction is essential to the authority of a court to decide a case. *Texas Ass'n of Bus.*, 852 S.W.2d at 443. Standing, as a necessary component of a court's subject matter jurisdiction, is a constitutional prerequisite to maintaining suit. *Id.* at 444; *In re C.M.C. & J.T.C.*, 192 S.W.3d 866, 869 (Tex.App.-Texarkana 2006) (orig. proceeding). The standing requirement under Texas law stems from two limitations on subject matter jurisdiction: the separation of powers doctrine and the open courts provision, "which contemplates access to the courts only for those litigants suffering an injury." *Texas Ass'n of Bus.*, 852 S.W.2d at 443–44; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (standing in federal law is essential and unchangeable requirement of case-or-controversy requirement of Article III of Constitution). Standing in Texas state court requires (a) "a real controversy between the parties" that (b) "will be actually determined by the declaration sought." *Tex-*

*as Ass'n of Bus.*, 852 S.W.2d at 446. Subject matter jurisdiction is never presumed and cannot be waived. *Id.* at 443–44. If a party lacks standing, a court lacks subject matter jurisdiction to hear the case. *Id.* at 444; *In re C.M.C.*, 192 S.W.3d at 869.

An opinion issued in a cause brought by a party without standing is advisory because, rather than remedying actual or imminent harm, the judgment addresses only hypothetical injury. *Texas Ass'n of Bus.*, 852 S.W.2d at 444. Texas courts have no jurisdiction to render such opinions. *Id.* When a court has no jurisdiction over the subject matter, it has no capacity to act as a court and any judgment it renders is void. *State ex rel. Latty v. Owens*, 907 S.W.2d 484, 485 (Tex.1995); *see Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 76 (Tex.2000); *Volume Millwork, Inc. v. West Houston Airport Corp.*, 218 S.W.3d 722, 726 (Tex.App.-Houston [1st Dist.] 2006, no pet. h.) (op. on reh'g); *Mercer v. Phillips Natural Gas Co.*, 746 S.W.2d 933, 936 (Tex.App.-Austin 1988, writ denied).

To establish standing, the pleader is required to allege facts that affirmatively establish the court's jurisdiction to hear the cause. *Texas Ass'n of Bus.*, 852 S.W.2d at 446; *In re C.M.V. & D.A.V.*, 136 S.W.3d 280, 284 (Tex.App.-San Antonio 2004, no pet.). When a party lacks standing, the appropriate disposition is dismissal. *In re C.M.C.*, 192 S.W.3d at 870; *see also American Motorists Ins. Co. v. Fodge*, 63 S.W.3d 801, 805 (Tex.2001); *Texas Ass'n of Bus.*, 852 S.W.2d at 446. Dismissal for lack of subject matter jurisdiction does not decide the merits of the case. *In re C.M.C.*, 192 S.W.3d at 870.

Standing presents a question of law which the appellate courts review de novo. *See Hairgrove v. City of Pasadena*, 80 S.W.3d 703, 705 (Tex.App.-Houston [1st Dist.] 2002, pet. denied); *Brunson v. Wool-*

*sey*, 63 S.W.3d 583, 587 (Tex.App.-Fort Worth 2001, no pet.). However, when an appellate court questions jurisdiction for the first time on appeal, there is no opportunity to cure a defect in pleading facts that affirmatively establish standing. *Texas Ass'n of Bus.*, 852 S.W.2d at 446. Therefore, "[w]hen a Texas appellate court reviews the standing of a party sua sponte, it must construe the petition in favor of the party, and if necessary, review the entire record to determine if any evidence supports standing." *Id.*

### Carol's Standing Under Section 102.004(a) of the Family Code

Carol alleged that she had standing to intervene in the SAPCR based on Tammy's and Douglas's divorce under former section 102.004(a) of the Family Code. The majority fails to address this issue. I would hold, as we did in our November 22, 2006 opinion, that Carol did not satisfy the standing requirements of former section 102.004(a).

Former section 102.004(a) provided:

(a) In addition to the general standing to file suit provided by Section 102.003(13),[14] a grandparent may file an original suit requesting managing conservatorship if there is satisfactory proof to the court that:

(1) *the order requested is necessary because the child's present environment presents a serious question concerning the child's physical health or welfare;* or

(2) both parents, the surviving parent, or the managing conservator or custodian either filed the petition or consented to the suit.

Act of April 20, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 125, *amended by* Act of June 18, 1999, 76th Leg., R.S., ch. 1048, § 2, 1999 Tex. Gen. Laws 3877, 3878 (current version at TEX. FAM.CODE ANN. § 102.004(a)(1) (Vernon Supp.2006)) (emphasis added).

The burden of proof on the issue of standing to initiate a suit for managing conservatorship is imposed on the person seeking standing. *See In re Pringle*, 862 S.W.2d 722, 725 (Tex.App.-Tyler 1993, no writ) (stating that burden of proof to initiate suit is imposed upon grandparent petitioners). Thus, the court is required to make a threshold finding of serious and immediate concern for the welfare of the child based upon a preponderance of the evidence before a grandparent will have the right to sue for custody in an original suit. *In re R.D.Y.*, 51 S.W.3d 314, 325 (Tex.App.-Houston [1st Dist.] 2001, pet. denied).

"A child must be in imminent danger of physical or emotional harm for there to be a serious question concerning the child's physical health or welfare." *Id.; see also Forbes v. Wettman*, 598 S.W.2d 231, 232 (Tex.1980) (statute contemplates "a situation where the child [is] in imminent danger of physical or emotional harm and immediate action [is] necessary to protect the child"); *McElreath v. Stewart*, 545 S.W.2d 955, 958 (Tex.1977) (same); *In re Lau*, 89 S.W.3d 757, 759 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (stating that, before trial court renders temporary order, there must be "imminent danger of physical or emotional harm that requires immediate action to protect the child"); *In re Pringle*, 862 S.W.2d at 724–25 ("The

---

14. Section 102.003 provides general standing to file an original suit affecting the parent-child relationship (SAPCR). TEX. FAM.CODE ANN. § 102.003 (Vernon Supp.2006). Subsection 102.003(13) grants standing to relatives of the child within the third degree to seek conservatorship, possession, or access if the child's parents are both deceased at the time the petition is filed. *Id.* § 102.003(13). Carol did not allege that she had standing to intervene under section 102.003(13) or any other provision of section 102.003.

Supreme Court has held that the elements of seriousness and immediacy as drafted in the statute require that the child be in imminent danger of physical or emotional harm and that immediate action is necessary to protect it.").

Here, Carol did not allege any facts to support her intervention to seek managing conservatorship of K.C. pursuant to section 102.004(a).[15] Nor did the trial court make any finding that K.C. was in imminent danger of physical or emotional harm from her mother or that immediate action was necessary to protect her from Tammy. *See In re R.D.Y.,* 51 S.W.3d at 325. Nor is there a scintilla of evidence in the record that K.C. was in imminent danger of physical or emotional harm from Tammy on October 18, 2002, when Carol filed her petition in intervention, or three days later, on October 21, 2002, when the court removed Tammy as managing conservator of K.C., named Carol temporary managing conservator, and removed K.C. from Tammy's immediate possession to Carol's. Rather, the record reflects that Tammy had made serious allegations about her fears for K.C.'s physical and emotional harm in *Douglas's* care as justification for her failure to turn K.C. over to Douglas for unsupervised visitation. Thus, Carol failed to establish her standing to sue for and obtain possession and control of K.C. *See id.; In re Pringle,* 862 S.W.2d at 726.

Carol argues, however, on rehearing, that she did not have to show that there was "a serious and immediate question concerning the welfare of the child" in order to have standing to intervene to seek managing conservatorship of K.C. under former section 102.004(a)(1) of the Texas Family Code. Rather, she contends that this was a requirement of former section 11.03(b) of the Family Code, which was "eliminated" when the Code was amended and recodified in 1995. She contends that, as a grandparent seeking managing conservatorship in a SAPCR filed after 1995 and before June 18, 2005, when section 102.004 was again amended, she had only to show that "the child's present environment present[ed] a serious question concerning the child's physical health or welfare" and that was a lesser standard of proof than the prior standard that this Court, relying on superseded case law, erroneously applied. *See* Act of April 20, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 125, *amended by* Act of June 18, 1999, 76th Leg., R.S., ch. 1048, § 2, 1999 Tex. Gen. Laws 3877, 3878 (current version at TEX. FAM.CODE ANN. § 102.004(a)(1) (Vernon Supp.2006)) ("TEX. FAM.CODE ANN. § 102.004"). Carol further contends that when section 102.004(a) was again amended effective April 18, 2005, the burden of proof was reduced even further in that it now grants standing to a grandparent to file a suit seeking managing conservatorship of a child if "the child's present circumstances would significantly impair the child's physical health or emotional development." *See* TEX. FAM.CODE ANN. § 102.004(a)(1) (Vernon Supp.2006). I would hold that her contention is without merit.

In sum, Carol contends that our November 22, 2006 opinion was erroneous in that we "cited case authority that interpreted a statute of the Texas Family Code that is no longer in effect in its requirement that the Trial Court make a threshold finding of serious and immediate concern for the welfare of the child." She alleges that, since 1995, a grandparent can seek managing conservatorship of a child under sec-

---

**15.** In her supplemental briefing, Carol argued that former section 102.004(a)(1) granted her standing, but she cited no evidence of a serious question concerning the physical health or welfare of K.C. at the time the trial court allowed her to intervene.

tion 102.004(a) of the Family Code without making such a showing.

The Texas Supreme Court specifically addressed the intent of the 1995 recodification of Title 2 of the Family Code, in which former section 11.03(b) was repealed and recodified as section 102.004(a)(1). *Jones v. Fowler*, 969 S.W.2d 429 (Tex.1998). The issue in *Jones* was whether the removal of the word "immediately" from renumbered section 11.03(8) of the Family Code upon its 1995 recodification as section 102.003(9) of the Code substantively changed the standing requirement for a person who had had actual possession and control of a child "for at least six months immediately preceding the filing of the petition" for conservatorship. *Id.* at 431. The court held that the standing requirement did *not* change. It opined:

> In 1995, Title 2 of the Family Code was recodified and amended by House Bills 655 and 433, respectively. Act of April 20, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 113–282; Act of June 16, 1995, 74th Leg., R.S., ch. 751, §§ 5–122, 1995 Tex. Gen. Laws 3888, 3889–932. The House Bill Analysis of H.B. 655, the bill recodifying Title 2 of the Family Code, states as its intent, "a *nonsubstantive* recodification of the statutes relating to parents and children and suits affecting the parent-child relationship. *This recodification does not make changes in the meaning or intent of the present law.*" HOUSE COMM. ON JUVENILE JUSTICE & FAMILY ISSUES, BILL ANALYSIS, Tex. H.B. 655, 74th Leg., R.S. (1995) (emphasis ours). The Senate Bill Analysis of H.B. 655 indicates that the bill "recodifies and reenacts" the statute. SENATE COMM. ON JURISPRUDENCE, BILL ANALYSIS, Tex. H.B. 655, 74th Leg., R.S. (1995). Moreover, the House Bill Analysis of H.B. 433 states that H.B. 655 "nonsubstantively recodified the Family Code." HOUSE COMM. ON JUVENILE JUSTICE & FAMILY ISSUES, BILL ANALY-SIS, Tex.C.S. H.B. 433, 74th Leg., R.S. (1995).

> While H.B. 655 merely recodifies the former Family Code, the purpose of H.B. 433 was to substantively revise the Family Code by amending H.B. 655, with the substantive changes listed in a "Section by Section Analysis." *Id.* [S]ubsection (9) is not listed among the substantive changes. *Id.* Similarly, no substantive changes to subsection 102.003(9) are listed in the Senate Bill Analysis for H.B. 433. SENATE COMM. ON JURISPRUDENCE, BILL ANALYSIS, Tex.C.S. H.B. 433, 74 Leg., R.S. (1995) (a 27–page document comprehensively listing all intended substantive changes to Title 2 of the Family Code). In summary, there is no indication that the Legislature intended the deletion of "immediately" from subsection 102.003(9) to be a substantive change in the application of the law.

*Jones*, 969 S.W.2d at 431–32 (emphasis in original). Because the 1995 changes to Title 2 were non-substantive except where specifically noted in the legislative history, persons who alleged standing to file suit for managing conservatorship of a child under revised section 102.003(9) of the Family Code still had to prove that they had had actual possession and control of the child for the six months immediately preceding their suit. *See id.*

The reasoning in *Jones* applies equally to the 1995 recodification of section 11.03(b) of the Family Code as section 102.004(a)(1). Like section 102.003(9), which, upon recodification, omitted the word "immediately" as a qualifier to the concern that must be proved to provide standing to a grandparent to file an original suit for custody of a child, recodified section 102.004(a) omitted the word "immediately" as a qualifier to the permission to intervene to seek managing conserva-

torship granted a grandparent when "the child's present environment presents a serious question concerning the child's physical health or welfare." *See Jones*, 969 S.W.2d at 431. However, just as Senate Bill Analysis for House Bill 433 failed to list section 102.003(9) as among the sections of the Act to which substantive changes were made, it also failed to list section 102.004. *See* SENATE COMM. ON JURISPRUDENCE, BILL ANALYSIS, Tex.C.S. H.B. 433, 74 Leg., R.S. (1995). Therefore, under *Jones*, the changes made to former section 11.03(b) of the Family Code when it was recodified as section 102.004(a)(1) in 1995 did *not* substantively change prior law.[16] *See Jones*, 969 S.W.2d. at 431–32. Thus, a grandparent seeking managing conservatorship of a child under section 102.004(a)(1) of the Family Code after 1995 still had to prove a serious and *immediate* concern for the child's "physical health or welfare."

Carol's assertion that a grandparent asserting standing to intervene in divorce proceedings to seek appointment as managing conservator of a child under section 102.004(a)(1) of the Family Code as it existed between 1995 and 2005 was not required to show that her suit was necessitated by an "immediate and serious concern" for "the physical health or welfare" of the child is without merit.

I would hold that Carol failed to establish her standing to seek managing conservatorship of K.C. under section 102.004(a) of the Family Code.

### Carol's Standing to Intervene Under Section 102.004(b) of the Family Code

Carol did not allege that she had standing to intervene to seek managing conservatorship of K.C. under any other section of the Family Code. However, because this Court raised the issue of her standing for the first time on appeal, we were required to consider the record to determine whether she had standing to intervene in the SAPCR attendant on Tammy's and Douglas's divorce to seek managing conservatorship of K.C. under any provision of the Code. We held in our November 22, 2006 opinion that the record did not support the conclusion that Carol had such standing.

On rehearing, the majority *sua sponte*— and exclusively—addresses section 102.004(b) of the Family Code, without drawing any distinction between former and current sections 102.004(b), and determines that Carol had standing under that section. We did not address former section 102.004(b) in our November 22, 2006 opinion because Carol did not allege that she had standing to intervene under that section of the Code; nor, after being given the opportunity by the Court to brief the issue of her standing prior to issuance of our November 22, 2006 opinion, did she allege or argue that she had standing under section 102.004(b); nor did she make any such allegation in her motion for rehearing; nor did our review of the record reveal any basis for standing under former section 102.004(b). That section required that any grandparent unable to maintain an original suit for managing conservator-

---

**16.** Section 102.004 was again amended in 1999, but the only change was to rewrite the introductory paragraph to read, "In addition to the general standing to file suit provided by Section 102.003(13), a grandparent may file an original suit requesting managing conservatorship if there is satisfactory proof to the court that...." *See* TEX. FAM.CODE ANN.

§ 102.004(a). The prior introductory paragraph read, "An original suit requesting managing conservatorship may be filed by a grandparent if there is satisfactory proof to the court that...." Act of June 18, 1999, 76th Leg., R.S., ch. 1, § 2, 1999 Tex. Gen. Laws 3877, 3878. Thus, the 1999 amendment is inapplicable to the issues in this case.

ship of a child who intervened in an ongoing SAPCR seeking managing conservatorship under section 102.004(b) must prove *"substantial past contact with the child"*; and the record affirmatively established that Carol had had *no* prior contact with K.C. Yet Carol's standing under section 102.004(b) is the *only* standing issue addressed by the majority on rehearing. Its interpretation and application of that section is, in my view, profoundly wrong and, if correct, would be unconstitutional.

Generally, an intervenor must show standing to maintain a suit in her own right in order to intervene. *Segovia–Slape v. Paxson*, 893 S.W.2d 694, 696 (Tex.App.-El Paso 1995, orig. proceeding); *McCord*, 777 S.W.2d at 812. Both former and present section 102.004(b) of the Family Code, however, additionally provide that grandparents who have substantial past contact with the child may be granted leave to intervene in a SAPCR. Thus, a grandparent need not have standing sufficient to institute a SAPCR in her own right in order to have standing to intervene in a pending SAPCR. *See Segovia–Slape*, 893 S.W.2d at 696. This relaxed standing rule promotes the overriding policy in all SAPCRs, that of protecting the best interest of the child. *Id.*

At the time Carol moved to intervene in this suit, subsection 102.004(b) provided:

> (b) An original suit requesting possessory conservatorship may not be filed by a grandparent or other person. However, the court may grant a grandparent or other person deemed by the court to have had *substantial past contact with the child* leave to intervene in a pending suit filed by a person authorized to do so under this subchapter.

Act of April 20, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 125 (current version at Tex. Fam.Code Ann.

§ 102.004(b) (Vernon Supp.2006) (emphasis added)).

In 2005, while this suit was pending, the Legislature amended the second sentence of subsection 102.004(b) to read:

> However, the court may grant a grandparent or other person deemed by the court to have had *substantial past contact* with the child leave to intervene in a pending suit filed by a person authorized to do so under this subchapter *if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development.*

Tex. Fam.Code Ann. § 102.004(b) (Vernon Supp.2006) (emphasis added), codifying Act of 2005, 79th Leg., R.S., ch. 916, § 3, 2005 Tex. Gen. Laws 3148, 3149. Thus, since this suit was filed, the Legislature has strengthened the requirements for intervention under section 102.004 so that a grandparent or other non-parent who is unable to establish standing to bring an original suit for managing conservatorship but who intervenes in an ongoing SAPCR to seek managing conservatorship of a child, not only (1) must prove substantial past contact with the child but also (2) must prove that "appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development." The current statute, therefore, places a very heavy threshold burden on a grandparent seeking to intervene in a SAPCR.

Notably, although former section 102.004(b), unlike amended section 102.004(b), permitted a grandparent who established substantial past contact with a child to intervene to seek managing conservatorship under former section 102.004(b) without also having to prove

standing to file an original suit for managing conservatorship, most grandparent intervenors did make such proof and thus would also have been able to satisfy the more stringent requirements for intervention imposed by the 2005 amendment to section 102.004(b). *See Chavez v. Chavez,* 148 S.W.3d 449, 455–56 (Tex.App.-El Paso 2004, no pet.) (holding that when children had resided with grandparents for several months during pendency of divorce proceedings, grandparents had standing to intervene and seek managing conservatorship under former section 102.004(b) and section 102.003(9)); *In re C.M.V.,* 136 S.W.3d at 285 (holding that grandparents who had had actual possession and control of children for more than six months immediately prior to suit had standing under section 102.003(a)(9) to intervene in father's suit to modify custody in order to seek managing conservatorship of children); *In re R.D.Y.,* 51 S.W.3d at 318–19, 324–25 (holding that maternal grandmother had standing to intervene in pending SAPCR to seek managing conservatorship of child pursuant to former section 102.004(b) and section 102.004(a) where she had substantial past contact with child, there was evidence of abuse and neglect of child by mother, and mother had been arrested and had subsequently engaged in bizarre and dangerous behavior towards child, had attacked grandmother with frying pan and hedge clippers, and had been involuntarily committed to psychiatric center, all of which established serious and immediate concern for welfare of child); *In re Hidalgo,* 938 S.W.2d 492, 495–96 (Tex.App.-Texarkana 1996, no pet.) (holding that court could permit grandparent or other person having substantial past contact with child to intervene in pending SAPCR even though original suit request-

ing possessory conservatorship could not be filed by grandparent or other person; and further holding that step-grandmother had standing to intervene to seek managing conservatorship of child under section 102.004(b) and section 102.003(9) where natural mother abandoned child after birth; parents were divorced; natural father remarried; father had custody of child; after father died, child lived first with stepmother, then with step-grandmother, and mother first sought custody when child was eleven years old).[17]

By contrast, the record in this case establishes that Carol could not have satisfied the standing requirements of former section 102.004(b), much less the stricter standing requirements under the current statute, any more than she could have satisfied, or did satisfy, the standing requirements of former section 102.004(a). She did not have substantial past contact with K.C.; nor did she contend that she did; nor did she even argue that she had standing to intervene under section 102.004(b). On direct-examination, Carol responded that she had only seen K.C. "[n]ot more than once" in K.C.'s entire life before the trial court named her temporary managing conservator and gave her immediate possession of K.C. Carol also agreed that she was a "complete stranger" to K.C. Although "substantial past contact" is not defined in the Family Code, under any definition, this testimony does not rise to the level of showing substantial past contact with the child so as to grant standing to intervene. *See In re C.M.C.,* 192 S.W.3d at 872 (in determining standing, court's inquiry into grandparent's substantial past contact should focus on amount of actual contact that occurred be-

---

17. Satisfaction of the substantial past contact requirement was not and is not necessary for a grandparent to have standing to intervene in an ongoing SAPCR when the grandparent has standing to maintain an original suit in her own right. *See Chavez v. Chavez,* 148 S.W.3d 449, 456 (Tex.App.-El Paso 2004, no pet.).

tween grandparents and children rather than difficulties in maintaining contact; and holding that despite correspondence and telephone calls with mother and children, grandparents who had only physically met older grandchild twice and had never seen younger grandchild lacked standing to maintain suit for adoption on termination of parental rights); *Segovia–Slape*, 893 S.W.2d at 696–97 (denying leave to intervene when no evidence of substantial past contact was introduced other than allegation that child had resided with aunt for several weeks); *cf. In re C.M.C.*, 192 S.W.3d at 872 & n. 10 (listing cases in which court had found substantial past contact satisfying standing requirement).

Plainly, there is *no* legal basis for a judicial determination that Carol had standing to intervene in the instant suit to seek managing conservatorship of K.C. The majority, however, mentions none of this law. It concludes, with bare citation to general principles of standing to intervene under some of the cases mentioned above, and with specific citation only to *McCord*, that a grandparent had in 2001, and still has, standing to intervene in an ongoing SAPCR to seek managing conservatorship of a child at the mere discretion of the trial court. Accordingly, it holds that the trial court did not err in allowing Carol to intervene in Tammy's and Douglas's divorce proceedings to seek to wrest sole managing conservatorship of K.C. from her mother on both a temporary and a permanent basis.

The majority does not explain how the reading of the law it attributes to *McCord*, a pre-Code case, can be reconciled with the plain language of former section 102.004(b), codified *after McCord* was decided, which sets out the Legislature's statutory requirements for intervention by a grandparent.[18] Nor does the majority explain—or even allude to—the large body of law construing both former and current section 102.004(b) that is inconsistent with its opinion.

Most importantly, the majority does not explain how former section 102.004(b) could possibly have been constitutional if its interpretation of Texas law is correct, since it interprets former section 102.004(b) as granting a state court trial judge even *greater* discretion to interfere with the constitutional right of parents to rear their own child than the Washington State statute governing mere *access* to a child the United States Supreme Court held unconstitutional under the Due Process Clause in *Troxel v. Granville. See* 530 U.S. 57, 61, 72–73, 120 S.Ct. 2054, 2058, 2064, 147 L.Ed.2d 49 (2000) (invalidating Washington State statute that permitted state court to order that grandparents have *visitation* rights to child over objections of fit parent "when visitation may serve the best interest of the child whether or not there has been any change of circumstances").

The Texas Supreme Court has, like the United States Supreme Court, recently explicitly recognized the constitutional right

---

**18.** *McCord* states that "grandparents who intervene in a proceeding are not required to plead and prove the requirements of § 11.03(b)." *McCord v. Watts*, 777 S.W.2d 809, 812 (Tex.App.-Austin 1989, no writ). Section 11.03(b) is the predecessor to section 102.004 *(a)*, which states the requirements of standing to bring an original suit, not to section 102.004(b). At the time *McCord* was decided there was no statutory provision regarding standing to intervene in a SAPCR. Thus *McCord* is properly construed as holding only that grandparents do not have to satisfy the requirements for bringing an original SAPCR to be allowed to intervene in an ongoing SAPCR. Under the Code Construction Act, the requirements of section 102.004(b) supersede any inconsistent prior holding in *McCord. See* Tex. Gov't Code Ann. §§ 311.025, 311.026 (Vernon 2005).

of a fit parent to raise her own child without interference due to a state court judge's determination, in the exercise of his discretion, that the child's best interest will be enhanced by interfering with that right, opining that " '[s]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family.' " *In re Mays–Hooper*, 189 S.W.3d 777, 778 (Tex. 2006) (quoting *Troxel*, 530 U.S. at 68, 120 S.Ct. at 2061). Like the United States Supreme Court in *Troxel*, the Texas Supreme Court in *Mays–Hooper* overturned court-ordered *access* by a grandparent to a child over the mother's objection. *See id.* In sum, the majority points to *no* sustainable legal principle to justify its determination that Carol established standing to intervene to seek managing conservatorship of K.C., and it overlooks, and effectively overrules, the large body of controlling law, including United States and Texas Supreme Court law, that contravenes its opinion.

I would hold that Carol plainly failed to establish standing to seek managing conservatorship of K.C. under former section 102.004(b) of the Family Code in that she neither pled nor proved that she had had substantial past contact with K.C., and the record conclusively establishes that she did not have the contacts required for standing to intervene in the SAPCR attendant on Tammy's and Douglas's divorce or to seek managing conservatorship of K.C.

### Appointment of Carol as Temporary Managing Conservator of K.C. and Transfer of Possession from Tammy to Carol

Having summarily concluded, in contravention of established law, that Carol had standing to seek and obtain both temporary and managing conservatorship of K.C., the majority makes no reference to the subsidiary issues raised by Carol on rehearing that are pertinent to determining her rights with respect to K.C. These critical issues are addressed below.

In addition to arguing, incorrectly, in her motion for rehearing that she did not have to show that K.C. was in imminent danger of physical or emotional harm in order to have standing to seek managing conservatorship under former section 102.004(a) of the Family Code, Carol argues that it was not necessary for the trial court to make a threshold finding of serious and immediate concern for the welfare of K.C. before issuing *temporary* orders removing Tammy as court-ordered managing conservator of K.C. and appointing Carol as temporary sole managing conservator of K.C.; transferring immediate possession of K.C. from her mother, Tammy, to Carol; ordering Tammy to pay child support to Carol; enjoining Tammy from telephoning Carol or going within 50 feet of her house; and permitting Tammy to have supervised visitation with K.C. for only four hours every two weeks at SAFE. Carol contends that the "immediate question" requirement is "an alternative and not a mandatory requirement on the trial court before it renders temporary orders."

The majority does not address this issue. I consider it to be critical to the determination of the validity of the trial court's orders, hence of Carol's rights. Therefore, I consider this Court bound to address it under Rule 47.1. I would hold that Carol's argument is without merit.

Carol intervened in Tammy's and Douglas's divorce on Friday, October 18, 2001, and, after having jailed Tammy for having repeatedly disobeyed its order that Douglas have daily unsupervised visitation of K.C. and failing to bring K.C. to the Friday hearing, on Monday, October 21, 2001, the associate judge divested Tammy of sole managing conservatorship of K.C., appointed Carol sole temporary managing

conservator, and transferred immediate possession of K.C. from Tammy to Carol. The October 18 and 21 hearings were, therefore, a de facto habeas corpus proceeding to which section 157.374 of the Family Code applies. When the habeas corpus statute, section 157.374, applies, valid temporary orders may issue only upon satisfaction of its terms.

Section 157.374 provides, in its entirety, "Notwithstanding any other provision of this subchapter, the court may render an appropriate temporary order if there is a *serious immediate question concerning the welfare of the child.*" TEX. FAM.CODE ANN. § 157.374 (Vernon 2002) (emphasis added). In a habeas corpus action, the party who proves a right to immediate possession under a prior order of the court (here, Tammy) is entitled to possession unless the trial court makes a written finding in temporary orders that there is a serious immediate question concerning the child's welfare. *Whatley v. Bacon,* 649 S.W.2d 297, 299–300 (Tex.1983) (order appointing maternal grandparents as temporary managing conservators of their grandchildren was not properly made pursuant to statute in absence of any allegation that there existed serious immediate question concerning welfare of grandchildren; maternal grandparents were not entitled to possession of their grandchildren under statute because they had no parental rights in absence of valid court order granting them right to possession); *McElreath,* 545 S.W.2d at 957–58; *see also In re G.R.W.,* 191 S.W.3d 896, 898 n. 1 (Tex. App.-Texarkana 2006, no pet.) ("[I]n a habeas corpus action to obtain immediate possession of a child, the party who proves immediate possession under some prior order is entitled to possession unless the trial court makes a written finding in temporary orders that there is a 'serious immediate question' concerning the child's welfare...."); *In re Lau,* 89 S.W.3d at 759 (same). "[A]n oral finding is not suffi-

cient." *In re Lau,* 89 S.W.3d at 759. There was no such written finding in this case; nor was there any evidence to support such a finding.

The supreme court has repeatedly spelled out the degree of seriousness or immediacy that allows a court to issue a temporary order transferring immediate possession of a child, namely when "the child [is] in imminent danger of physical or emotional harm and immediate action [is] necessary to protect the child." *McElreath,* 545 S.W.2d at 958; *see also Whatley,* 649 S.W.2d at 299; *Forbes,* 598 S.W.2d at 232; *In re Lau,* 89 S.W.3d at 759 (acknowledging that "[t]he Texas Supreme Court has defined 'serious immediate question' to mean imminent danger of physical or emotional harm that requires immediate action to protect the child"). The standard is the same for the issuance of a temporary custody order. *See McElreath,* 545 S.W.2d at 958.

A judge who issues an order transferring the possession and temporary custody of a child without making the necessary factual findings acts without authority and the orders are invalid. *See Whatley,* 649 S.W.2d at 299–300 (holding order awarding grandparents temporary custody of children invalid when order did not include fact finding of serious immediate question concerning welfare of the children; court was not presented with record of hearing; and application for habeas corpus made no allegation of serious immediate question concerning welfare of children).

Here, as in *Whatley,* the trial court removed Tammy as sole managing conservator of K.C., removed K.C. from Tammy's possession, and appointed Carol temporary managing conservator even though Tammy was entitled to possession of K.C. as managing conservator under a valid prior court order, which Carol lacked standing to challenge. Therefore, Carol had no le-

gal right to an order granting her immediate possession of K.C., and the trial court's order was invalid. *See Whatley*, 649 S.W.2d at 300 (if only relator is entitled to possession by virtue of court order, court must compel return of child to relator). In addition, the trial court made no written finding that K.C. was in imminent danger of physical or emotional harm from her mother, Tammy, or that immediate action was necessary to protect K.C. Nor was there any evidence in the record to support such findings. Nor could the habeas corpus statute, section 157.374, have conferred *standing* on Carol to intervene in Tammy's or Douglas's divorce proceedings to seek either a temporary order or a permanent order naming her managing conservator of K.C. That proof had to come from satisfaction of the requirements of either former section 102.004(a) or former section 102.004(b) of the Code, which Carol, likewise, did not provide.

I would hold that the trial court erred, first, in permitting Carol to intervene; second, in transferring sole managing conservatorship from Tammy to Carol in a temporary order; and third, in removing K.C. from the immediate possession of her mother, the sole managing conservator of K.C. under the court's prior order, and transferring immediate possession of K.C. to Carol without proof of serious and immediate danger to K.C. in her mother's possession. Therefore, the trial court's orders were invalid in every respect and conferred *no* legitimate parental rights on Carol. *See id.*

### Determination of the Best Interest of K.C.

Carol contended in her original appellate brief and contends in her motion for rehearing that, to obtain modification of the conservatorship order, Tammy must prove that it would be in K.C.'s best interest that she, K.C.'s natural mother, rather than Carol, a non-parent, have managing conservatorship of K.C. The majority agrees. It assumes that to affirm the trial court's appointment of Carol as sole managing conservator of K.C., it need only look for evidence from the divorce proceedings that, in its view, supports the conclusion that the trial court's rulings were within its discretion, *i.e.,* not "arbitrary or unreasonable." It states that Carol was required only to prove by a preponderance of the evidence that appointment of Tammy as sole or joint managing conservator would result in physical or emotional harm to K.C., that such disputes are "fact-intensive," and that "[a]ppellate courts routinely defer to the fact finder at trial concerning matters of credibility and demeanor." It thus reduces the burden of proof of a non-parent attempting to wrest managing conservatorship of a child away from a parent to a mere matter of "credibility and demeanor" in the trial judge's opinion, to which "[a]ppellate courts routinely defer." In short, the burden of proof reduces to nothing more than the trial court's absolute discretion to determine what it thinks would be in the child's best interest as between a parent and a non-parent based on the judge's opinion of the witnesses. This dramatic reduction in the burden of proof is unprecedented in Texas law and contrary to established constitutional, statutory, and case law.

Because I do not believe Carol established standing to assert any interest in the upbringing of K.C., I would dismiss her from this suit without reaching the issue of whether the trial court properly exercised its "discretion" to determine the best interest of K.C. However, the majority's omission of any reference to the constitutional issues in this case, its statement of the rights of non-parents to intervene in a lawsuit and to obtain sole managing conservatorship of a child, and its application of the law to the record in this case all compel review of the trial court's implied

determination—and the majority's holding—that Carol not only had standing to maintain her suit but carried the burden of proof of a non-parent seeking managing conservatorship of a child.

### Carol's Rights as Court–Ordered Managing Conservator of K.C.

First, as the Texas Supreme Court held in *Whatley,* invalid court orders transferring custody and immediate possession of a child confer *no* parental rights on a grandparent. *See* 649 S.W.2d at 300. Nor does a judgment that a court lacks jurisdiction to render convey any rights; it is void. *See id.; State ex rel. Latty,* 907 S.W.2d at 485.

Here, Carol lacked standing to intervene in Tammy's and Douglas's divorce proceedings to seek managing conservatorship of their minor child, K.C., and she failed to prove either that there was a serious and immediate concern for K.C.'s welfare, so as to establish her standing under section 102.004(a), or that she had had substantial past contact with K.C., so as to establish her standing under section 102.004(b). Nor did Carol establish that K.C. was in imminent danger of physical or emotional harm from her mother so that immediate action under the habeas corpus statute, section 157.374, was necessary to protect K.C.

Therefore, the trial court's orders appointing Carol as temporary managing conservator of K.C., removing K.C. from Tammy's immediate possession, granting Tammy only supervised visitation of K.C. for four hours every two weeks at SAFE, ordering Tammy to pay child support to Carol, and enjoining Tammy from telephoning Carol or going within 50 feet of her house were all invalid, and its judgment appointing Carol permanent sole managing conservator of K.C. is void. *See Whatley,* 649 S.W.2d at 300 (when there is prior valid order governing possession of child, writ of habeas corpus cannot be used as vehicle for redetermination of right to possession and any such order is invalid); *State ex rel. Latty,* 907 S.W.2d at 485; *Mercer,* 746 S.W.2d at 936. Thus, Carol has no parental rights with respect to K.C. Tammy, however, does, both under the United States Constitution and under the prior, valid order naming her sole managing conservator of K.C., which was improperly set aside by the trial court.

### Constitutional Due Process Violations

Tammy has asserted throughout this appeal that the trial court's orders violated her constitutional due process rights. Again, the majority fails even to address, much less to decide, this constitutional issue, although it is clearly necessary to final disposition of this appeal given the majority's holding affirming Carol's right to permanent sole managing conservatorship of K.C.[19] I agree with Tammy.

The United States Supreme Court has long recognized that a parent's right to "the companionship, care, custody, and management" of his or her children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer,* 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). In fact, the Supreme Court has emphasized that "the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel,* 530 U.S. at 65, 120 S.Ct. at 2060. Likewise, the Texas Supreme Court long ago concluded that "this natural parental

---

19. *See* TEX.R.APP. P. 47.1 (requiring appellate court to address issues raised by pleadings and necessary to final disposition of appeal).

right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). Thus, "the relationship between parent and child is constitutionally protected." *Troxel,* 530 U.S. at 66, 120 S.Ct. at 2060 (citing *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978)). Parents have the responsibility and the right to direct the upbringing and education of their children. *Id.* at 65, 120 S.Ct. at 2060 (citing *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925)). In fact, it is "cardinal" that the custody, care, and nurture of a child reside in the parents. *Id.* (citing *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944)).

It is now firmly established that the Due Process Clause of the Fourteenth Amendment to the United States Constitution protects the fundamental rights of parents to make decisions concerning the care, custody, and control of their children. *Troxel,* 530 U.S. at 66, 120 S.Ct. at 2060; *see also Holick,* 685 S.W.2d at 20; *In re Mays–Hooper,* 189 S.W.3d at 778. As the Supreme Court opined in *Troxel,* "[T]he Due Process Clause does not permit States to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Troxel,* 530 U.S. at 72–73, 120 S.Ct. at 2064. In other words, what the majority approves as the law of this State is exactly what *Troxel* condemns as unconstitutional.

The majority references none of this law, but its holding that a state court judge may allow a grandparent to intervene to seek managing conservatorship of a child whenever it believes the child's best interest would be enhanced and its further holding that whether the grandparent satisfies the burden of proof of a non-parent seeking managing conservatorship is a

"fact-intensive" inquiry that comes down to the trial judge's estimate of the credibility of the witnesses necessarily disregards the constitutional issue and denies its applicability. Were I to reach this issue, I would hold that by allowing Carol to intervene and obtain sole managing conservatorship of K.C. without any showing of physical or emotional harm to K.C. to justify its actions, and then by reaffirming its decision in making its invalid orders permanent, the trial court clearly abused its discretion and violated Tammy's fundamental due process right to the care, custody, and control of her child.

## Burden of Proof of Non–Parent *With* Standing to Seek Managing Conservatorship of a Child

The majority, however, moves directly from its determination that Carol had standing to seek temporary and permanent sole managing conservatorship of K.C. to its determination that she satisfied the burden of proof imposed upon a nonparent who seeks managing conservatorship of a child by overcoming the strong presumption in Texas law that the best interest of a child is served if a natural parent is appointed as a managing conservator. *See* TEX. FAM.CODE ANN. § 153.131(a) (Vernon 2002); *In re V.L.K.,* 24 S.W.3d 338, 341 (Tex.2000); *Lewelling v. Lewelling,* 796 S.W.2d 164, 166 (Tex. 1990); *In re De la Pena,* 999 S.W.2d 521, 527 (Tex.App.-El Paso 1999, no pet.); *In re A.D.H. & S.J.H.,* 979 S.W.2d 445, 447 (Tex.App.-Beaumont 1998, no pet.). In other words, it moves directly to Carol's contention on appeal that Tammy should not be appointed managing conservator of K.C. and argues that Carol was validly appointed over Tammy and, therefore, should remain sole managing conservator, an argument that cannot stand scrutiny under either the law or the record of this case.

Section 153.131(a) of the Family Code statutorily provides for the appointment of a parent as sole managing conservator, or the parents as joint managing conservators, unless the court finds the appointment would not be in the best interest of the child because it would significantly impair the child's physical health or emotional development. *See* TEX. FAM.CODE ANN. § 153.131(a). "The ... language requiring a showing that appointment of the parent would significantly impair the child's physical or emotional development creates a strong presumption in favor of parental custody and imposes a heavy burden on a non parent." *Lewelling,* 796 S.W.2d at 167.

Thus, even if a non-parent, such as a grandparent, has standing to sue for conservatorship of a child, he must still overcome the strong presumption in Texas law that a parent should be appointed managing conservator. This parental presumption is deeply embedded in Texas law. *In re V.L.K.,* 24 S.W.3d at 341; *Lewelling,* 796 S.W.2d at 166. Specifically, it is grounded in the constitutionally recognized "essential right" and "basic civil right" of a parent to raise his or her child. *In re M.W.,* 959 S.W.2d 661, 665 (Tex.App.-Tyler 1997, no writ) (quoting *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972)). In other words, this statutory presumption is grounded in the constitutional right of a fit parent to raise her child without interference by the state.

Thus, for the court to award managing conservatorship to a non-parent *with*

standing, "the nonparent must affirmatively prove by a preponderance of the evidence that appointment of the parent as managing conservator would *significantly impair* the child physically or emotionally." *Lewelling,* 796 S.W.2d at 167. It is wholly inadequate simply to present evidence that a non-parent would be a better choice as custodian of the child. *Id.* To carry his burden, a nonparent seeking managing conservatorship of a child must "offer evidence of *specific actions or omissions of the parent* that demonstrate an award of custody to the parent would result in *serious physical or emotional harm to the child." Id.* (emphasis added).[20]

The majority states that it is invoking the law of this State, but there is absolutely no evidence to support the trial court's having removed K.C. from Tammy's care, custody, and control in the first place. And, by transposing this in to a case where Carol is a legitimate managing conservator of K.C. and any testimony by her interested witnesses is sufficient to support the trial court's absolute discretion as to who should have custody of K.C. as between Tammy, a parent, and Carol, a non-parent, the majority opinion is far more deferential to a non-parent's "rights" and a state court's discretion than any prior Texas cases.

Prior case law has indicated the types of acts or omissions that demonstrate significant impairment of the child, such as physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior on the part of the parent. *See Brook v.*

---

**20.** The presumption in section 153.131(a) is subject to section 153.004 of the Code, which requires that, "[i]n determining whether to appoint a party as a sole or joint managing conservator, the court shall consider evidence of the intentional use of abusive physical force by a party against the party's spouse, a parent of the child, or any person younger than 18 years of age committed within a two-year period preceding the filing of the suit or during the pendency of the suit." TEX. FAM.CODE ANN. § 153.004 (Vernon 2002 and Supp. 2006). The court must consider credible evidence "of a history or pattern of past or present child neglect, or physical or sexual abuse by one parent directed against the other parent, a spouse, or a child." *Id.* § 153.004(b) (Vernon Supp.2006).

*Brook,* 881 S.W.2d 297, 298 (Tex.1994); *In re Hidalgo,* 938 S.W.2d at 494, 497 (affirming appointment of mother and step-grandmother as joint managing conservators when mother effectively abandoned child after birth; child was raised first by father and stepmother, then, after father's death by stepmother, and then by step-grandmother; and mother first sought custody when child was eleven years old); *Thomas v. Thomas,* 852 S.W.2d 31, 32–36 (Tex. App.-Waco 1993, no writ) (holding trial court did not err in appointing maternal grandmother as managing conservator when evidence showed grandmother had been child's primary caretaker for years; father had history of criminal conduct, drug and alcohol use, dishonesty, unemployment, and instability and had abandoned and failed to support child; and mother, who had immoral and unstable life-style and had exposed child to violence, asked court to award managing conservatorship to grandmother).

The "[e]vidence must support the logical inference that some *specific, identifiable behavior* or conduct of the parent will probably cause that harm." *In re M.W.,* 959 S.W.2d at 665 (emphasis added). The link between the parent's conduct and harm to the child may not be based on evidence which raises mere surmise or speculation of possible harm. *Id.; see Lewelling,* 796 S.W.2d at 167–68 (holding that evidence that parent is victim of spousal abuse and that parent is unemployed, living in crowded conditions, and had multiple visits to mental hospital was *no evidence* that awarding custody to parent would significantly impair child); *In re M.W.,* 959 S.W.2d at 667 (holding that trial court erred in appointing grandmother managing conservator because evidence that mother left child with grandmother by agreement for two years while she attended college and obtained degree, parents had argued in the past, and court-appointed psychologist believed grandmother

would be a better choice because parents were too immature, defensive and angry at one another to be good parents raised only *"speculation* of possible harm") (emphasis added); *In re W.G.W.,* 812 S.W.2d 409, 414–15 (Tex.App.-Houston [1st Dist.] 1991, no writ) (holding evidence of significant impairment *insufficient* to overcome parental presumption when mother and non-parent seeking custody had unsuccessful marriage, child lived with non-parent for period of time, mother and non-parent abused each other while child was in home, including mother's brandishing fire poker in front of children and trying to stab non-parent with knife in front of children, and mother constantly changed residences).

Here, there is absolutely no evidence of any specific, identifiable behavior by Tammy before or after her daughter was taken away from her, such as physical abuse, severe neglect, or abandonment of K.C. or her other children, drug or alcohol abuse, instability, violence, or any other specific, identifiable behavior that could establish the necessary link between Tammy's having custody of K.C. and K.C.'s being in danger of serious physical or emotional harm.

The associate judge made *no* evidentiary findings to support his initial orders removing K.C. from Tammy's possession, granting Carol temporary sole managing conservatorship and immediate possession of K.C., enjoining Tammy from telephoning Carol or going within 50 feet of her residence, and ordering Tammy to have only supervised visitation with K.C. at SAFE for four hours every other week, when K.C. was only fifteen months old.

Nor did the trial court conduct any hearing on the custody orders in June 2003, when K.C. was two years old, when it received the psychologist's report the court had itself commissioned from Dr. Silverman. Had it done so, it could not

have rationally discounted as simply "not credible" Dr. Silverman's detailed findings, his conclusion that Tammy exhibited *none* of the behavior found in the foregoing cases to constitute grounds for removing a child from her mother's custody, or his opinion that K.C. should be returned to her mother and Tammy and Douglas named joint managing conservators, with Douglas to have limited access initially and be ordered to take counseling for alcoholism. Frankly, it is dismaying that the trial court saw no need to make *any* inquiry at that time into the circumstances into which it had removed K.C., either when it took her away from Tammy or even after being put on notice by Dr. Silverman of the substantiation of Tammy's allegations of Douglas's violence, alcoholism, and spousal abuse, of at least some substantiation of Tammy's allegations that A.C. had been sexually abused by Douglas, and of findings by SAFE and reports by Douglas's former girlfriend indicating that Carol was neglecting K.C. and placing her in a violent and filthy environment.

K.C. was almost three years old and had been in Carol's custody for a year and a half when the custody hearing was held. No evidence was presented in the custody hearing of any abuse of any of her children by Tammy, nor was there any evidence of any link between any specific act by Tammy and any physical or emotional harm to K.C. Instead, the testimony in the divorce proceedings established that K.C. was in good emotional and physical health when she was removed from Tammy's possession and control and that Tammy had good parenting skills; and there was no evidence of neglect or alcohol or drug abuse or immoral behavior on Tammy's part that had affected K.C. emotionally or physically. There was expert testimony by the court-appointed psychologist, Dr. Silverman, that Tammy had psychological problems, which he described as being "out in left field" and failing to follow court or-

ders, but that they did not affect her parenting abilities, which were very good. This testimony reflected Dr. Silverman's earlier report to the court, in which he recommended that K.C. be returned to her mother, as he did at trial.

There was speculative testimony based on hypotheticals posed by Carol's counsel as to whether K.C. would be harmed if Carol persisted in a behavior pattern of calling CPS when K.C. was in Carol's and Douglas's possession or having repeated examinations of K.C. to determine whether Douglas had sexually abused her, but Dr. Silverman testified that he did not see foresee future behavior by Tammy harmful to K.C. Dr. Silverman also testified that Tammy sincerely believed that Douglas had abused A.C. and might be abusing K.C.; that A.C.'s psychologist, Jane Markley, supported Tammy's belief that A.C. had been molested; and that photographs taken at SAFE substantiated Tammy's accusations of neglect of K.C. by Carol. Carol's witnesses, including a physician, testified, however, that Tammy's fears for K.C. were groundless.

None of this testimony amounted to more than a scintilla of evidence that Tammy was an unfit mother or that K.C.'s being in the sole managing conservatorship of her mother "would significantly impair the child's physical health or emotional development," even had K.C. been taken from her mother pursuant to constitutionally and statutorily valid proceedings and even had Carol proved that she had standing to assert parental rights to K.C., which she did not. *See* Tex. Fam.Code Ann. § 102.004(a)(1); *In re Pringle*, 862 S.W.2d at 726 (court-appointed expert's opinions that despite personality imperfections, child was normal, nontraumatized six-year-old established that paternal grandparents failed to discharge their burden of proving that child was in imminent

danger of physical or emotional harm or that immediate action was necessary to protect her from such harm, so that paternal grandparents did not have standing to bring suit to remove mother as sole managing conservator). It was wholly inadequate for Carol to argue that she would be a better custodian of K.C. than Tammy. *See Lewelling,* 796 S.W.2d at 167; *see also Troxel,* 530 U.S. at 72–73, 120 S.Ct. at 2064.

On this record, even if Carol had established her standing to seek managing conservatorship of K.C., which she did not, she still would not have overcome the strong parental presumption that Tammy, K.C.'s natural parent, should continue as managing conservator of K.C. and that Carol, a non-parent, should not be awarded managing conservatorship.

### Preservation and Promotion of Indian Culture

Finally, observing that Douglas is one-half Coushatta Indian, and that, therefore, K.C. is one-quarter Native American, Carol contends that we should expand the best-interest-of-the-child standard in a SAPCR filed in connection with state court divorce proceedings to "include promotion of the preservation of the Indian culture." The majority does not address this issue, although it too is necessary to the final disposition of this appeal since there are indications in the record that the associate judge did, in fact, give great weight to Carol's insistence that this case was governed by the Indian Child Welfare Act, which has as one of its goals the preservation of Indian Culture.

Throughout this litigation, Carol has urged the applicability of the "Indian Child Welfare Act" to this case and to the determination of K.C.'s best interest. In her appellate brief, Carol argued that "Indian tribal sovereignty is recognized in the Indian Child Welfare Act declaration of poli-cy, which states that the best interest of an Indian child is protected by promoting the stability of tribes and families in order to promote the preservation of Indian culture." *See* 25 U.S.C. § 1901(3), (4). She urges on rehearing that "[t]he determination of the best interest of an Indian child must include consideration of tribal family practices." *See id.* § 1902.

The Indian Child Welfare Act provides, in relevant part, that "[i]n any State court proceeding *for the foster care placement of, or termination of parental rights to,* an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding." *Id.* § 1911(c) (emphasis added). The Act further provides that "[i]n any State court proceeding *for the foster care placement of, or termination of parental right to,* an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe...." *Id.* § 1911(b) (emphasis added).

This case is a SAPCR filed in connection with Tammy's and Douglas's state court divorce proceedings into which Carol was improperly allowed to intervene. The instant proceedings are neither proceedings for the foster care placement of K.C. nor proceedings for the termination of parental rights to K.C. Therefore, the Indian Child Welfare Act is inapplicable to this case. *See Comanche Indian Tribe v. Hovis,* 53 F.3d 298, 302 (10th Cir.1995), *cert. denied,* 516 U.S. 916, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995) ("[T]he ICWA does not apply to 'child custody proceedings' pursuant to divorce proceedings."); *DeMent v. Oglala*

*Sioux Tribal Court,* 874 F.2d 510, 514 (8th Cir.1989) (same).[21]

The only proper factors for the trial court to consider in determining the best interest of K.C. are those applicable in a SAPCR attendant on divorce proceedings under the Texas Family Code, not factors applicable to cases for termination of parental rights and placement in foster care brought under the Indian Child Welfare Act. Carol's contention that the promotion of the preservation of Indian culture should be considered as a factor in determining the best interest of an Indian child in a SAPCR attendant on the state court divorce proceedings of her natural parents is without merit.[22]

I would hold that Carol failed to establish standing to seek either temporary or permanent managing conservatorship of K.C. and that she failed to establish any immediate right to possession of K.C., any right to custody of K.C., or any parental rights to K.C. The trial court lacked jurisdiction to remove K.C. from Tammy's immediate possession to Carol's, to remove Tammy as sole temporary managing conservator of K.C., and to appoint Carol permanent managing conservator of K.C.; its temporary orders issued in connection with possession and custody of K.C. were invalid; and its judgment naming Carol permanent managing conservator of K.C. was void. *See Texas Ass'n of Bus.,* 852 S.W.2d at 444; *Whatley,* 649 S.W.2d at 300; *In re C.M.C.,* 192 S.W.3d at 869. When a trial court lacks subject matter jurisdiction over a suit, the proper remedy is dismissal. *See Am. Motorists Ins. Co.,* 63 S.W.3d at 805; *In re C.M.C.,* 192 S.W.3d at 870.

## Conclusion

K.C. is now six and a half years old. She has been kept from her mother by invalid and unconstitutional state court orders since she was fifteen months old. Her saga is not over. I would withdraw our November 22, 2006 opinion and substitute this opinion. I would reverse the judgment of the trial court and render judgment that the appointment of Carol Whitworth as sole managing conservator of K.C. is void and that Carol Whitworth is dismissed from these proceedings, and I would remand this case to the trial court with instructions to reinstate Tammy Whitworth as sole managing conservator of K.C. and to conduct any such other and further proceedings as may be necessitated by this opinion.

---

21. On December 19, 2003, Carol filed a motion under the Indian Child Welfare Act, 25 U.S.C. § 1911, to sever custodial proceedings from the divorce proceedings and to transfer jurisdiction to the Coushatta tribe on the ground that K.C. was one-fourth Coushatta. *See* 25 U.S.C. § 1911(b) (entitled "Transfer of proceedings; declination by tribal court"). On March 19, 2004, the trial court denied Carol's motion to sever because of Tammy's exercise of her parental veto and held that it would retain jurisdiction. Likewise, the Coushatta tribe moved to intervene under the Act, and the trial court permitted the intervention. The trial court erred in entertaining these motions since it had no subject matter jurisdiction under the Indian Child Welfare Act.

22. I note that Tammy testified in the divorce proceedings that she had never tried to disenroll K.C. as a Coushatta tribe member, as Carol alleged; she tried only to transfer her membership to the Livingston tribe in Texas from the Louisiana Tribe, which was a decision Tammy, as K.C.'s mother, had the constitutional right to make.