

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-251-CV

IN THE INTEREST OF B.P., JR., A CHILD

-----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

-----------

## MEMORANDUM OPINION[1]

-----------

### I. INTRODUCTION

Appellant Maria P. appeals an order appointing the Department of Family Protective Services (DFPS) as permanent managing conservator of B.P. In her first two points, Maria argues that the evidence is legally and factually insufficient to support the trial court's finding that appointing Maria as managing conservator would significantly impair B.P.'s physical and emotional

---

[1] *See* TEX. R. APP. P. 47.4.

development.  In her third point, Maria asserts that the trial court abused its discretion by failing to appoint her as possessory conservator of B.P.  We will affirm in part and reverse and remand in part.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Maria is the mother of ten-year-old B.P., who has been diagnosed with bipolar disorder, psychotic disorder, oppositional defiant disorder, and attention deficit hyperactivity disorder.  Prior to this case, Child Protective Services (CPS) had received six referrals regarding Maria and her care for B.P.  These referrals, some for medical neglect, were eventually either "ruled out" or labeled "unable to determine."

The current case with B.P. began in December 2005 when either Maria or her cousin, Nina F., called CPS to come and remove B.P. from Nina's house. Both Maria and B.P. were living with Nina at the time of removal.[2]  The incident that led to the removal began as an argument over a toy between B.P. and Nina's boyfriend.  The incident escalated, and B.P. climbed in a tree and threw — or at least threatened to throw — rocks at the boyfriend's car.  Although Maria claims that Nina actually called CPS and that she never talked to CPS on

---

[2] Maria had agreed with CPS on a safety plan that placed B.P. with Nina.  The plan also included that Maria should not live with B.P. at Nina's house.

2

that occasion, Cacana Young, a CPS investigator, testified that after the incident, Maria told her that she thought it would be in B.P.'s best interest if he received treatment and was placed in a foster home.

CPS took custody of B.P. in December 2005, and since that time, B.P. has been placed in one shelter, five foster homes, and has been hospitalized four times. B.P. is now being treated and monitored at a residential treatment center in Victoria, Texas. On December 28, 2005, DFPS filed a suit affecting the parent child relationship, seeking termination of Maria's parental rights and permanent managing conservatorship of B.P. After a hearing on June 14 and 22, 2007, the trial court found that it would be in B.P.'s best interest to appoint DFPS as managing conservator. The trial court made clear to both parties that the ultimate goal in the case is to have B.P. return to his home with Maria. The trial court also dismissed DFPS's petition to terminate Maria's parental rights without prejudice.

### III. MANAGING CONSERVATORSHIP

In her first two points, Maria argues that the evidence is legally and factually insufficient to support the trial court's finding that appointing Maria as managing conservator would significantly impair B.P.'s physical and emotional development.

## A. Standards of Review

We give wide latitude to a trial court's decision on custody, control, possession, and visitation matters. *Earvin v. Dep't of Family & Protective Servs.*, 229 S.W.3d 345, 350 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). We will not reverse a conservatorship finding unless the record demonstrates that the trial court abused its discretion. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Whitworth v. Whitworth*, 222 S.W.3d 616, 622–23 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (op. on reh'g). Under an abuse of discretion standard, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error; rather, they are simply factors in assessing whether the trial court abused its discretion. *Gardner v. Gardner*, 229 S.W.3d 747, 751 (Tex. App.—San Antonio 2007, no pet.).

In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) Did the trial court have enough information upon which to exercise its discretion; and (2) did the trial court err in applying its discretion? The traditional sufficiency review comes into play with regard to the first question. *In re W.M.*, 172 S.W.3d 718, 725 (Tex. App.—Fort Worth 2005, no pet.); *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex.

4

App.—Fort Worth 2002, pet. denied). With regard to the second question, we determine, based on the elicited evidence, whether the trial court made a reasonable decision. *W.M.*, 172 S.W.3d at 725; *T.D.C.*, 91 S.W.3d at 872.

**B.      Section 153.131 – Significant Impairment**

There is a strong presumption that the best interest of a child is served if a natural parent is appointed as a managing conservator. *Whitworth*, 222 S.W.3d at 623; *see also* TEX. FAM. CODE ANN. § 153.131(a) (Vernon 2002). Section 153.131 provides that a parent shall be appointed sole managing conservator unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development. TEX. FAM. CODE ANN. § 153.131(a).

For the court to award managing conservatorship to a non-parent under section 153.131, the non-parent must prove a significant impairment by a preponderance of credible evidence. *Whitworth*, 222 S.W.3d at 623; *see also* TEX. FAM. CODE § 105.005 (Vernon 2002) ("Except as otherwise provided by this title, the court's findings shall be based on a preponderance of the evidence."); *J.A.J.*, 243 S.W.3d at 616. There must be evidence to support the logical inference that some specific, identifiable behavior or conduct of the parent will probably cause that harm. *Whitworth*, 222 S.W.3d at 623. Indeed,

5

the non-parent must offer evidence of specific acts or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child. *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990); *Whitworth*, 222 S.W.3d at 623.

An adult's future conduct may be somewhat determined by recent past conduct; however, evidence of past misconduct, in and of itself, may not be sufficient to show present unfitness. *Whitworth*, 222 S.W.3d at 623. Specific acts or omissions of a parent implicating a significant impairment to a child's emotional development may be inferred from direct evidence. *Id*. However, this link between the parent's conduct and harm to the child may not be based on evidence which merely raises a surmise or speculation of possible harm. *Id*.

### 1.   *Maria*

DFPS's primary concern is that Maria is unable, at this time, to provide a stable environment for B.P. The record supports this concern as two CPS caseworkers and one of Maria's former counselors testified about Maria's instability and its effect on B.P.

DFPS cites multiple living arrangements over the course of the case as a contributing factor to her instability. At the time of the hearing, Maria lived in an apartment in Garland, Texas, where she had been for two months. However, according to Tonyia Brown, a CPS caseworker, Maria had moved at

least six times since the case began, which was at that time, approximately eighteen months.

DFPS also points to Maria's employment history as evidence of instability. Young testified that Maria was not employed at the time of B.P.'s removal. Brown stated that Maria had not had stable employment throughout the case. Maria testified that she was working at the time of B.P.'s removal and that she had always worked since B.P. was born. However, when asked where she had been employed over the two years prior to the hearing, Maria responded as follows:

> Well, I haven't been employed for the last year. I was kind of recovering from my son being taken, so I didn't work prior to this job. I worked at the Waffle House for a little while *because they told me I had to get a job* when they first took my son, but then after that *I just kind of didn't want to work* and then before that, I worked at Owens Auto. (Emphasis added).

Maria stated that Owens Auto "let [her] go" partly because CPS began calling. At the time of the hearing, she was employed at Quality Moving Systems and performed some type of insurance work. Brown later testified that she did not have any proof of income from Maria's new job although she had contacted Maria at the work phone number that she had provided.

DFPS argues that Maria's instability is evidenced by the considerable testimony regarding visitations with B.P. DFPS set up weekly visits between

7

Maria and B.P. that were ultimately discontinued after Maria missed several visits in a row. Brown stated that Maria had missed visits for close to two months straight and failed to keep in contact with Brown during that time period. Maria testified that she had missed only four visits with B.P. around the time that her mother passed away. She disputed that she had ever missed more than four visits, but when she was confronted with her testimony from a previous hearing regarding missed visits in April, May, and June 2006, she said, "Well, I don't really recall a lot of the stuff that happened back then. I was grieving my mother." She also claimed that CPS did not make visits available to her after B.P. had been allegedly "mistreated" by a foster parent. Brown testified that B.P. was never kept from seeing Maria because of an injury or abuse allegations. CPS cancelled three visits because either B.P. was sick or there were transportation difficulties, but it made up every visit it was responsible for cancelling.

Brown testified that Maria had also not consistently participated in phone therapy with B.P. Maria stated that she had taken part in one phone-therapy session and that she had tried to participate in more but that B.P.'s therapist at the residential treatment center never returned her phone calls.

DFPS asserts that Maria has shown instability by not completing her service plan. Specifically, DFPS set up for Maria counseling or therapy sessions

8

with two separate agencies, but both times, the counseling sessions were discontinued based on Maria's noncompliance with scheduled visits. Daniels-Rice, Maria's second counselor, worked with Maria on her depression, self-esteem, and helping her become more stabilized to be able to care for her children. Daniels-Rice diagnosed Maria with depression but stated that Maria never accepted that diagnosis. In response to this testimony, Maria said that Daniels-Rice never diagnosed her with depression.

In total, Maria made sixteen counseling sessions with Daniels-Rice over six months, but the sessions were eventually cancelled after Maria missed seven visits. Daniels-Rice generally cancels counseling cases after two missed visits, but she kept Maria longer because she felt that Maria needed to be stabilized on medication to help treat her depression, which Daniels-Rice thought contributed to her missed appointments. Daniels-Rice stated that Maria worked hard when she showed up for the counseling visits. She also stated that Maria needs to continue counseling although she is unwilling to see Maria again because of her agency's policy on missed visits.

DFPS set up a third counseling session for Maria, but Brown stated that to her knowledge, Maria had not set up an appointment as of the time of trial. Maria stated that if B.P. were returned to her, she would make sure to attend all required counseling sessions.

Maria still needs to complete her psychiatric evaluation, which was recommended after she completed her psychological evaluation. Maria claims that she has tried to set up the psychiatric evaluation but that it has been difficult because of her busy schedule. She stated, however, that she has been "certified" through other agencies such as North Star and Mental Health Mental Retardation. She also needs to complete her education at the Bipolar Foundation. Additionally, DFPS recommends that Maria complete family counseling with B.P. and B.P.'s fourteen-year-old sister, who, after eight years away, is now living with Maria.

Maria completed a parenting class through the Child and Family Guidance Center as part of her service plan and is now participating in a program called Step Up Parenting, which is designed specifically for parents of children who have mental disabilities but is not part of her service plan. She claims that while she is not currently seeing a therapist that Step Up Parenting is a "therapy setting."

### 2. B.P.

The supreme court has noted that "the act of a parent in placing a child in an unstable environment is the very type of conduct that the Legislature contemplated would significantly impair the physical or emotional development

10

of a child."[3]  *See Lewelling*, 796 S.W.2d at 167 n.4.  Here, structure and stability, or lack of such qualities, are paramount concerns in our decision.  As set forth below, the severity of B.P.'s psychological condition requires it.

Although Maria denies knowledge of some incidents and outright disputes others, there was testimony presented at the hearing that demonstrates a long history of psychological disturbances that at times ended in injuries or threatened injuries to B.P. and others.  Before the case began, B.P. experienced auditory and visual hallucinations, and at one point, B.P. attempted to kill

---

[3] In *Lewelling*, the supreme court stated that the mother's unemployment and crowded living conditions amounted to no evidence of significant impairment to the child.  796 S.W.2d at 167.  Justice Doggett, writing for the majority, referenced a portion of Justice Gonzalez's dissenting opinion, in which Justice Gonzalez argued that the failure to remove a child from an unstable environment might not be considered an act or omission under the majority's standards if not caused by the parent.  *See id.* at 167 n.4, 171.  Justice Gonzalez stated that under the majority's holding, if a parent chooses to live with the child in a "rat infested crack house with drug addicts or partner swapping friends, but the parent does not use drugs," the Court would apparently reverse the placement of the child with a non-parent.  *Id.* at 171 n.4.  In response, as set forth above, Justice Doggett stated that placing a child in an unstable environment could be evidence of conduct that supported an impairment finding but that the evidence in Justice Gonzalez's hypothetical is the very type of evidence that was "patently absent" from the record in that case.  *Id.* at 167 n.4.

We do not suggest that the facts here are in line with the extreme hypothetical outlined by Justice Gonzalez, but Maria's inconsistent actions regarding her service plan and counseling sessions evidence an unstable environment that is not conducive to a structured physical and emotional development.

11

himself. At age seven, B.P. was twice admitted to psychiatric hospitals. Since the inception of the case, B.P. has continued to have numerous emotional and physical outbursts, leading to B.P.'s placement at a residential treatment facility.

At one foster home, B.P. became upset when certain children at the home were put in "timeout." He then picked up a trophy and struck the foster parent in the head. B.P. ran away from home—a common theme throughout the case—and when he returned, the foster parents tried to restrain B.P. and calm him down. B.P. responded by grabbing a knife and threatening the foster parents. The foster parents called the police, and when the police arrived, B.P. still had the knife drawn. B.P. ended up throwing rocks at everyone before the police were able to restrain him in handcuffs and take him to Timberlawn Hospital for psychiatric evaluation.

Another time, B.P. ran away from school, and when he returned, his foster parent picked him up and attempted to take him to the hospital. B.P. got into the car but later jumped out into traffic. B.P. was not hurt during this incident although he was again taken to Timberlawn Hospital. On a different occasion, B.P. became upset when he could not get in contact with Maria and attempted to run away. Unable to open the door, B.P. broke through the glass to escape. The glass cut B.P, and he later received stitches for the injury.

12

Also, since he has been at the residential treatment center, he has displayed self-harming behaviors, such as biting himself and hitting his head into other objects. Brown stated that he still exhibits some of the self-harming behaviors at the center but not as much as he once did. Lastly, as mentioned above, B.P. argued with Nina's boyfriend over a toy and threw rocks at his car. Maria disputes that B.P. ever threw rocks and asserts that she eventually calmed him down before he caused any damage.

Maria claims that the reason B.P. has had so many problems in CPS's custody is because he feels like he has "been ripped out of [her] home." Maria believes that B.P. "feels abandoned" and if he were returned to her that his misbehavior would not continue except for problems in readjusting to living at home.

## C.    Conclusion

We recognize that Maria has taken some steps to stabilize her life, but there remains a list of incomplete requirements that we cannot ignore. Most notably, Maria has shown an inability to consistently meet her own mental health needs by failing to schedule a psychiatric evaluation and twice failing to complete the recommended counseling sessions because of noncompliance with scheduled visits. And as of the time of trial, she still had not taken the affirmative step to continue counseling even though a third counseling session

13

had been set up for her. Before CPS placed B.P. in the residential treatment center, Maria also missed several visitations with B.P., resulting in CPS cancelling the weekly visitations. Further, although unemployment will not support a significant impairment finding[4]—and in fact Maria was employed at the time of the hearing—Maria has shown an indifference in the past towards securing steady employment in light of CPS's request that she work after losing possession of B.P.[5] Maria has not completed the bipolar education classes recommended to her after her psychological evaluation; however, she has completed a parenting class and is enrolled in Step Up Parenting.

Given Maria's inconsistent behavior, her inability to do what was asked of her to regain custody of B.P., and B.P.'s extreme need for structure and stability, it was within the trial court's discretion to conclude that appointing Maria as managing conservator of B.P. would significantly impair B.P.'s physical and emotional development. Thus, we hold under the appropriate standards of review that the trial court did not abuse its discretion by appointing DFPS as managing conservator. *See Earvin*, 229 S.W.3d at 351 (holding that the trial

---

[4] *See Lewelling*, 796 S.W.2d at 167.

[5] Maria stated, "I worked at the Waffle House for a little while *because they told me I had to get a job* when they first took my son, but then after that *I just kind of didn't want to work* and then before that, I worked at Owens Auto." (Emphasis added).

14

court did not abuse its discretion by determining that the appellant was not willing to provide an environment conducive to his daughter's physical health and emotional development when the appellant visited the child only once during DFPS's temporary conservatorship and failed to complete his court-ordered service plan, which included parenting classes, drug tests, and counseling).  We overrule Maria's first two points.

## IV. POSSESSORY CONSERVATORSHIP

In her third point, Maria argues that the trial court abused its discretion by not appointing her as possessory conservator.  Maria's attorney requested during closing argument that the trial court appoint Maria as managing conservator, but, in the alternative, he asked that if the trial court determined that it was in B.P.'s best interest for him to stay at the residential treatment center, that the trial court appoint Maria as possessory conservator.  The trial court's order did not mention possessory conservatorship but did state that all relief requested but not expressly granted is denied.  Additionally, Maria stated in her motion for new trial on the order naming DFPS as managing conservator—which the trial court denied—that the trial court abused its discretion by not appointing her as possessory conservator.

The State agrees with Maria that the trial court abused its discretion. The State asserts that "the trial court seems to have granted [Maria] the rights she

15

requested as a possessory conservator without any of the obligations. . . . Maria appears to be correct in her assertion that the trial court abused its discretion when it failed to formally name her as possessory conservator." While we disagree on the exact reasoning that the trial court erred, we ultimately agree with both parties that the trial court should have appointed Maria possessory conservator.

If a managing conservator is appointed, the court may appoint one or more possessory conservators. TEX. FAM. CODE ANN. § 153.006(a) (Vernon 2002). The court *shall* appoint as a possessory conservator a parent who is not appointed as a sole or joint managing conservator *unless* it finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child. *Id.* § 153.191. (Emphasis added).

The trial court made no express findings regarding the appointment of Maria as possessory conservator. The trial court, however, ordered that Maria shall have reasonable visitation and access to B.P. as agreed upon and arranged by DFPS, indicating that the court did not find that parental access would endanger the physical or emotional welfare of the child.

Though courts sometimes use the words possession and access interchangeably, they are used differently in the Texas Family Code. *In re*

16

*Walters*, 39 S.W.3d 280, 284 (Tex. App.—Texarkana 2001, no pet.). A person with a right of access to a child may approach him, communicate with him and visit with him, but may not take possession or control of the child away from the managing conservator. *Id*. at 284–85. A person with a right to possession of a child may exercise possession and control of the child, to the exclusion of all other persons, including the managing conservator, during periods of possession. *Id*. at 285.

Maria and DFPS read section 153.191—and rely on *Hopkins v. Hopkins* as reading it in the same manner—to mean that if the trial court grants access to the child, then the trial court is compelled to appoint the parent, who was not named managing conservator, as possessory conservator. *See* 853 S.W.2d 134, 138 (Tex. App.—Corpus Christi 1993, no writ). We note that the *Hopkins* court based its decision on the previous version of the statute that differs from that at issue in this case.[6] And, in any event, we read the current statute as providing that a court could find that access would not endanger the child but that possession might endanger the child. Thus, if the court found that

---

[6] The statute, then section 14.03(d), stated: "The court shall appoint as a possessory conservator the parent who is not appointed as a sole or joint managing conservator unless it finds that *parental possession or access is not in the best interest of the child* and that parental possession or access would endanger the physical or emotional welfare of the child." *Hopkins*, 853 S.W.2d at 136. (Emphasis added).

17

appointment of the parent as possessory conservator would not be in the best interest of the child and that possession would endanger the child, the court would not be compelled to appoint the parent as possessory conservator, even if it found, as in this case, that access would not endanger the child.

The court is compelled to appoint the parent as possessory conservator unless it finds that (1) the appointment of the parent as possessory conservator is not in the best interest of the child, and (2a) parental possession would endanger the child or (2b) access would endanger the child. *See* TEX. FAM. CODE ANN. § 153.191. In sum, a finding either expressly or implicitly that access would not endanger the child's physical or emotional welfare does not entirely preclude the court's discretion in appointing a possessory conservator because the court could find that possession would endanger the child's physical or emotional welfare.

Because the court in this case found that B.P. needs to stay at the residential treatment facility and that it was not in his best interest to leave as of the time of trial, we can infer a finding that unrestricted possession would endanger B.P.'s welfare right now. We are mindful, however, that possession is not a sum total proposition. When a trial court appoints a parent possessory conservator, it can conclude that unrestricted possession would endanger the physical or emotional welfare of the child, but that restricted possession or

18

access would not. *Walters*, 39 S.W.3d at 286. A court can fashion a possession order that remedies the danger to the child's welfare by placing restrictions and conditions on possession or access. *Id*. Indeed, if the trial court appoints a possessory conservator, it may grant, deny, restrict, or limit the possessory conservator's possession of or access to the child. *See Hopkins*, 853 S.W.2d at 137. It may also grant, deny, restrict, or limit any rights, privileges, duties, and responsibilities with respect to the child as are necessary to protect the child's best interest. *Id*. However, because appointment of a parent as possessory conservator implies a finding that access by that parent will not endanger the physical or emotional welfare of the child, complete denial of access should be rare—i.e., when it is not in the best interest of the child. *Walters*, 39 S.W.3d at 286–87; *see also* TEX. FAM. CODE ANN. § 153.193 (Vernon 2002) ("The terms of an order that denies possession of a child to a parent or imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest of the child.").

In *Walters*, the trial court appointed the father as managing conservator and the mother as possessory conservator. *Id.* at 282. The trial court restricted the mother's access and possession because the mother had exhibited behavior in the past mainly relating to her alcoholism that supported

19

the finding that unrestricted possession of the child would endanger the child's welfare. *Id*. at 283 (citing evidence that the mother overdosed on drugs in a suicide attempt, drank to the point of passing out while the child was in her care, passed out and urinated in a chair, and had violent rages in front of the child). The court of appeals held that the potential danger to the child if the parent were granted unrestricted possession could be remedied by restricted possession or access. *Id*. at 287.

The trial court in that case stated that the mother shall have possession of the child at all times "mutually agreed between the parties." *Id.* at 283. It then stated in its findings of fact and conclusions of law that the mother must exhibit a three-year period of sobriety before implementation of the standard possession order would be in the child's best interest. *Id*.; *see also* TEX. FAM. CODE ANN. § 153.311 (Vernon 2002). The mother complained that the trial court erred by effectively denying her possession of and access to the child by ordering that she have possession at times "mutually agreed between the parties." *Walters*, 39 S.W.3d at 285. The court of appeals ultimately held that the problem was not that the trial court restricted possession and access—although it stated that the trial court should not completely deny access—but rather that the order was not sufficiently specific as to the times

and conditions for the mother's possession of or access to the child. *Id*. at 288.

Like in *Walters*, the evidence in this case regarding B.P.'s extreme emotional condition and Maria's inconsistent behavior as of the time of trial supports an implied finding that unrestricted possession of B.P. might endanger B.P.'s physical and emotional welfare. However, the court made clear that the end goal in this case is to have B.P. return to Maria. Additionally, Young testified that DFPS's plan is to gradually integrate Maria and B.P. back together to promote family reunification.

Thus, at some point when B.P. becomes more stable and when Maria shows an ability to take care of herself by completing services and establishing a stable lifestyle—i.e., conditions on possession—Maria could slowly, and with restrictions, begin to take possession of B.P. Thus, we cannot say that the trial court found that possession, albeit restricted possession, would endanger B.P. Accordingly, we hold that the trial court abused its discretion by not appointing Maria as possessory conservator,[7] and we sustain Maria's third point.

---

[7] Because the evidence supports findings that restricted access and possession would not endanger B.P., we need not address whether the appointment of Maria as possessory conservator is in B.P.'s best interest. *See* TEX. FAM. CODE ANN. § 153.191.

21

## V. CONCLUSION

Because we have overruled Maria's first two points and sustained her third, we affirm the trial court's judgment appointing DFPS as managing conservator and reverse the judgment regarding possessory conservatorship. We remand the case to the trial court for further proceedings consistent with this opinion.

DIXON W. HOLMAN
JUSTICE

PANEL B:  DAUPHINOT, HOLMAN, and WALKER, JJ.

DELIVERED: July 3, 2008

22